Connie Louise AGEE, Appellant,

v.

STATE of Indiana, Appellee.

No. 45S00–8710–CR–976.

Supreme Court of Indiana.

Oct. 4, 1989.

Roger T. Moore, Lake County Sp. Public Defender, Portage, for appellant.

Linley E. Pearson, Atty. Gen. and Wendy Stone Messer, Deputy Atty. Gen., Indianapolis, for appellee.

GIVAN, Justice.

A jury trial resulted in appellant's conviction of Murder, for which she received a sentence of forty (40) years.

The facts are: Appellant and her husband, Hardy Linton Agee, the victim in this case, resided with their two sons in Lake Station, Indiana. The Agees had been married for thirty-six years, and in addition to the two adopted children at home, they had three adult daughters and an adult son. All of the children testified as to their mother's dissatisfaction with the marriage and with their father who, due to ill health and financial problems, had become quite difficult. Appellant had told two of her adult daughters that if there was some way to do it without going to jail, she would kill their father.

On the day prior to the decedent's death, appellant conversed by telephone with Roger Gajewski, who was repairing the family automobile. She complained to him that her husband had beaten her and thrown her around. She stated that she was "going to get a gun and shoot that son-of-a-bitch." She also told one of their sons that his father was going to make her kill both of them, and if she did not do it, he would wake them up and kill them himself. The victim overheard this conversation between appellant and their son and remarked that she was "nuts."

The son testified that he never heard his father say anything concerning restrictions on their movement, their use of the telephone, and so forth. He stated that they were permitted to play and watch television as usual. At dinner that night, appellant told the boys that it would be better if their father was dead, and she was thinking about killing him in his sleep.

Later that night after they had gone to bed, the boys heard a "pop" and shortly thereafter, appellant came into their room saying she had shot their father and he was dead. She told the boys what to say to the police and indicated to them that she would die if they did not relate events just as she told them to.

Police received a telephone call from appellant's residence from a woman who was crying and saying she had just shot and killed her husband. When officers arrived at the scene, appellant was standing in the

doorway and said, "I killed my husband. I shot him." Appellant took the police to the bedroom where they discovered her husband lying in bed with a bullet wound in the right side of his head from a small caliber handgun which was found slightly under the pillow on the unoccupied side of the bed.

Police immediately read appellant her *Miranda* rights and asked her what had happened. She stated that she had been confined by her husband for three days and that he had tortured her and the children. She said that he had come to bed with a shotgun and a pistol and made some sexual demands. A struggle ensued, the pistol fell from his hand, and she shot him.

She then was taken to the police station where a second interview was held with Detective Szostek after she once again was advised of her rights. She made a statement which was reduced to writing, and when finished, she examined it for corrections which were made and she initialed each of those corrections. However, she then refused to sign the statement. In it she said, among other things, that during the struggle with her husband she remembers hearing a "pop," then seeing blood on his face. She did not recall pulling the trigger. She did state that she knew she was at very close range when the shot was fired.

■ Appellant contends the prosecutor's repeated use of the word "victim," in reference to the decedent, constituted reversible error. On several occasions, the prosecutor, in examining a witness, would refer to the decedent as the "victim." Upon objection by counsel for appellant, the judge would admonish her that it would be better if she used the word "decedent," which she then would do for the time being. Appellant takes the position that this was deliberate misconduct on the part of the prosecutor calculated to prejudice the jury against appellant.

Appellant claims that the situation was so egregious that her motion for mistrial should have been granted. We have previously held that a motion for mistrial should be granted only if the conduct was so prejudicial as to place the defendant in "a position of grave peril to which he should not have been subjected." *Edwards v. State* (1984), Ind., 466 N.E.2d 452, 455, citing *Morgan v. State* (1981), 275 Ind. 666, 671, 419 N.E.2d 964, 967. Whether a prosecutor's statement results in grave peril to a defendant's position is determined by the probable persuasive effect on the jury's decision. *Edwards, supra; Maldonado v. State* (1976), 265 Ind. 492, 355 N.E.2d 843.

The State correctly points out that the use of the term "victim" is not a legal term of art and that it is common for persons to use the term "victim" to describe anyone who has experienced an untoward event. It is common to speak of "victims of circumstance" or the "victim" of a disease, or the "victim" of any of the myriad of mishaps that might befall a human being. In examining the record in this case, it cannot be said that the use of the word "victim" by the prosecutor on several occasions was done vindictively but was only an inadvertent manner of speaking as might be done to characterize any person who had experienced a mishap.

Certainly, regardless of how the decedent had come to receive a gunshot wound, he could be described accurately as a victim of circumstance. Whether the prosecutor used the word "victim" or "decedent" seems to be of little moment. To say that the use of the one word as opposed to the other would conjure up prejudice against appellant in the minds of the jurors is indeed to stretch a point based upon semantics. We do not perceive that the conduct of the prosecutor in using the word "victim" from time to time placed appellant in "a position of grave peril to which she should not have been subjected." The record discloses that the trial court admonished the prosecutor pursuant to the objections of appellant's counsel and that the prosecutor responded to those corrections. We see no reversible error in the trial court's refusal to grant the motion for mistrial.

■ Appellant claims the State violated her right to a fair trial by withholding allegedly exculpatory evidence. The State

had called Dr. Opas Ratanaproeska as a witness. He is referred to in the transcript and in the briefs as Dr. Opas. He had performed an autopsy on the victim, and during the course of his testimony, it was disclosed that at one point in the procedure he had drawn the conclusion that the victim had committed suicide. However, further questioning developed that this conclusion had been reached before he had collected all of the information surrounding the victim's death.

Appellant takes the position that the State withheld the testimony of one Dr. Nichols, who had performed a second autopsy on the victim and had made a report which was in the possession of the State but which they failed to disclose to appellant. In fact, however, Dr. Nichols' conclusion was that the decedent had not committed suicide. Moreover, the State points out that the report of Dr. Nichols did not constitute discoverable evidence in that he was not called as a witness nor did the information contained in his report constitute exculpatory evidence as far as appellant was concerned. We thus are at a loss to see any harm done to appellant even if Dr. Nichols' information in fact was withheld by the State.

On the other hand, it appears that the information actually was known to appellant's counsel prior to their objection to the trial court. The record indicates that they had information that Dr. Nichols and Dr. Opas had disagreed concerning the circumstances of the death. We see no reversible error even if we presume for the sake of argument that the State withheld the information concerning the consultation between Drs. Nichols and Opas.

■ Appellant claims she was denied a fair trial when a State's witness, Robert Gajewski, who was not included on the witness list furnished by the State to appellant, was allowed to testify at trial. The record discloses that the prosecuting attorney stated that when the witness list was compiled and furnished to appellant's counsel, they did not know of a statement made by Robert Gajewski to the police, that when they discovered such statement had been made they immediately notified counsel for appellant, and that counsel for appellant acknowledged that he in fact was provided with that information on the day indicated by the State. He nevertheless claims he was surprised by the fact that Gajewski was called as a witness.

In a lengthy bench conference on this subject between the judge and counsel, while defense counsel insisted that even though they were furnished with the statement Gajewski made to the police they had no idea he would testify at trial, the State observed this certainly should have apprised them that he was a likely witness. The court informed counsel that he was entitled to a continuance if he felt he needed one to cope with the testimony of Gajewski.

The purpose of pretrial discovery is to promote justice and prevent surprise by allowing the defense adequate time to prepare its case. *Chandler v. State* (1981), 275 Ind. 624, 419 N.E.2d 142. Whether the State has been guilty of substantial noncompliance is within the discretion of the trial court. *Mers v. State* (1986), Ind., 496 N.E.2d 75. In *Mers* we further held that under this type of circumstance a continuance is a proper remedy "unless the State's action is so misleading as to demonstrate such bad faith that exclusion of the evidence is necessary to protect the defendant's fair trial rights." *Id.* at 83.

As above set out in this opinion, Mr. Gajewski's testimony was uncomplicated and to the point concerning a conversation he had with appellant just prior to her husband's death. In view of the fact that the State had furnished appellant's counsel with a copy of the statement on the very day they learned of it, we cannot find that the State so prejudiced appellant as to justify a reversal of this cause.

■ Appellant claims the trial court erred in overruling their motion in limine concerning the suppression of certain photographs of the decedent taken in the room in which he was found. Appellant also made proper objections at the time the State offered the photographs in evidence. This Court will not reverse the trial court

on the admission of photographic evidence of a murder victim if the photographs provide relevant evidence and their probative value is not outweighed by their tendency to inflame the passions of the jury against the defendant. *Raub v. State* (1987), Ind., 517 N.E.2d 80.

It hardly can be said that the photographs of any murder victim are not in one sense gruesome. However, the photographs presented in the case at bar are as innocuous as a photograph of a murder victim can be. We have stated repeatedly that we will not exclude photographic evidence merely because it depicts revolting or gruesome scenes. *Watkins v. State* (1988), Ind., 528 N.E.2d 456; *Drollinger v. State* (1980), 274 Ind. 5, 408 N.E.2d 1228. The photographs in this case unquestionably were an aid to the jury in understanding the conditions surrounding the victim's death. We see no error in the trial court's admission of the photographs.

Appellant claims the trial court erred in permitting the State to introduce evidence in rebuttal that should have been included in the State's case-in-chief. In rebuttal, the State called Detective Szostek to testify to the effect that appellant had told him at the Lake County Jail that the coroner had talked with her and asked her if there was any way the victim could have shot himself. She responded that such was not possible and that she would not lie about it. The scope of rebuttal evidence is left to the sound discretion of the trial court. *Wells v. State* (1982), Ind., 441 N.E.2d 458.

In the case at bar, there can be no question that Detective Szostek's testimony did in fact contradict the position of appellant that the coroner's view that the decedent might have been a victim of suicide should have been considered by the jury. We see no error in permitting the State to call Detective Szostek as a rebuttal witness.

Appellant claims the jury verdict is contrary to the evidence and to the law. However, in view of the facts above recited and the evidence presented in this case, there is ample evidence to support the verdict of the jury. This Court will not at-

tempt to reweigh that evidence. *Witte v. State* (1987), Ind., 516 N.E.2d 2.

The trial court is affirmed.

SHEPARD, C.J., and DeBRULER, PIVARNIK and DICKSON, JJ., concur.