[Cite as *State v. Madden*, 2017-Ohio-8894.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | No. 16AP-259 |
| | | (C.P.C. No. 15CR-740) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| Frederick Madden, | : | |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 7, 2017

**On brief:** *Ron O'Brien*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee.

**On brief:** *April F. Campbell*, for appellant.

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by defendant-appellant, Frederick Madden, from a judgment of conviction and sentence entered by the Franklin County Court of Common Pleas following a jury trial in which the jury returned verdicts finding him guilty of kidnapping, rape, and felonious assault.

{¶ 2} On February 13, 2015, appellant was indicted on one count of rape, in violation of R.C. 2907.02, one count of felonious assault, in violation of R.C. 2903.11, and one count of kidnapping, in violation of R.C. 2905.01. Each of the counts also carried a repeat violent offender specification.

{¶ 3} On January 30, 2015, Columbus Police Officer Kraig Gibson was dispatched to an address on Markison Avenue, Columbus, following a report of a female "who had been severely assaulted." (Tr. Vol. I at 48.) The woman told Officer Gibson that a male had forced her to the rear of a location "a few houses from where she was staying." (Tr.

Vol. I at 54.) Officer Gibson "called for a squad for her to be transported to the hospital because she had bad injuries, severely bad injuries." (Tr. Vol. I at 48.) Other officers arrived and "went back and found the scene." (Tr. Vol. I at 56.)

{¶ 4} Columbus Police Officer Joshua Jarrell and his partner, Officer Sam Moore, responded to a dispatch in the early morning hours of January 30, 2015, arriving at Markison Avenue shortly after Officer Gibson. The officers walked to the back of a vacant house and found some underwear and observed blood near a concrete stoop. The officers secured the scene until police detectives arrived.

{¶ 5} A.S., a 39-year-old female, resides on the west side of Columbus; in 2014 she was homeless. In January 2015, at the time of the events at issue, A.S. was staying with two friends, Dale and Connie, who had a residence near the intersection of Parsons and Markison Avenues.

{¶ 6} In the early morning hours of January 30, 2015, A.S. was returning to Dale and Connie's house after visiting with a friend. While A.S. was walking through an alley, she encountered a male who asked if she was working. A.S. testified that "[h]e questioned me and I said, 'I'm not working.' " A.S. related that she "kept walking and he grabbed me by my hair and punched me in my face." (Tr. Vol. I at 119.) The man dragged A.S. by her hair to the backyard of an abandoned house; during this time, he also punched her on the back of her head, the back of her ribs, and kicked her in the legs. A.S. was familiar with the abandoned house because she had previously slept at that location while homeless. Once in the backyard, A.S. testified that "[t]he beating got worse, * * * the blows, the kicks, the punching in my head and my face." (Tr. Vol. I at 132.)

{¶ 7} The man told A.S. that he had a gun. A.S. testified that the man "ripped my clothes off, threw it. Threw my pants, threw them. And my shoes, he threw them. Even my underwear with a maxi pad." (Tr. Vol. I at 132-33.) The man "[s]aid, 'Bitch, shut the fuck up.' " A.S. "told him [she] was cold." She "started to cry and * * * said, 'Please don't do this. I have kids.' " The man "said, 'Bitch, shut the fuck up,' again anytime I spoke." A.S. stated that her "whole face was hitting the concrete where it was ice and snow. And then he would punch me in my ribs and hit me in the back of the head again." (Tr. Vol. I at 133.) A.S. testified that the man then raped her "from behind." After "he was finished," he "kicked [her] and also spat on [her], told [her] to count to a hundred." (Tr. Vol. I at 134.) The man told her if she got up he would shoot her.

{¶ 8}  After the assailant left the scene, A.S. walked toward Parsons Avenue looking for a police officer.  She was bleeding, and walked to the residence of her friends Dale and Connie.  When she arrived, Connie "start[ed] to cry and sa[id], 'Oh, my God, what happened?' And Dale said, 'What happened?' "  (Tr. Vol. I at 136.)  They walked to a nearby fire station but were unable to locate anyone, so Dale called 911.

{¶ 9}  A police officer arrived and asked A.S. if "I could take him to where this happened to me and I said yes."  Connie and Dale also walked with A.S. and the officer, "and they started to see the blood trail."  (Tr. Vol. I at 139.)  A.S. testified that her assailant did not use a condom.  When asked how a condom could have been found in the area, A.S. stated that other females "use that place back there."  (Tr. Vol. I at 151.)  A.S. further testified that she and the father of one of her children previously engaged in sexual activity at that location, and that they would use condoms.

{¶ 10} A.S. testified that she was wearing a "maxi pad" that evening, and that her assailant used the maxi pad "to wipe himself off with."  (Tr. Vol. I at 152.)  Specifically, after the man told her to remain on her stomach and count to one hundred, A.S. "watched him wipe the blood away; so I watched him pick up my underwear and use them to wipe himself off with the maxi pad."  (Tr. Vol. I at 156.)  Police officers found the maxi pad near the scene.

{¶ 11} A.S. was transported to Grant Hospital for a rape kit examination and treatment for her injuries.  Her jaw was fractured in "three places," requiring surgery, and she remained in the hospital for more than a week. (Tr. Vol. I at 140.)  Police detectives subsequently interviewed A.S. and showed her a photographic array.  She was unable to identify her assailant from the array.  At trial, A.S. identified appellant as "[t]he guy that raped me."  (Tr. Vol. I at 158.)

{¶ 12} On cross-examination, A.S. stated she did not recall telling a police detective that her assailant was carrying a black semi-automatic handgun, or that he struck her with the weapon.  A.S. testified that the man was dressed in black and wearing a hoodie.

{¶ 13} Columbus Police Detective Tim Hedrick is assigned to the department's sexual assault unit.  Following the incident, Detective Hedrick and his partner were dispatched to Grant Hospital to speak with A.S.  Detective Hedrick testified that the woman "had been beaten, face was bloodied.  She was very upset, crying [and she] could barely open her mouth to speak."  (Tr. Vol. I at 231.)

{¶ 14} After leaving the hospital, the detectives drove to Markison Avenue and "were able to find the yard that she was talking about," located in the backyard of a vacant house. (Tr. Vol. I at 234.) Detective Hedrick took photographs of the scene, and noted there was blood on the "cement stoop." (Tr. Vol. I at 240.) Detectives collected a maxi pad from the stoop, and they also found a condom in the area.

{¶ 15} Detective Hedrick testified that appellant became a suspect in the case and detectives subsequently interviewed him and obtained buccal swabs from him. At trial, Detective Hedrick identified state's exhibit G as an array of six photographs prepared as part of the investigation. When shown the array by detectives, A.S. did not definitively identify any individuals. On cross-examination, Detective Hedrick testified that A.S. indicated her assailant struck her with a pistol during the incident.

{¶ 16} Carrie Jackson, a registered nurse, is coordinator of the sexual assault program at Grant Medical Center. On January 30, 2015, Jackson performed an examination of A.S. at Grant Hospital. A.S. informed Jackson that her assailant was a black male "unknown to her, stranger." (Tr. Vol. II at 36.) A.S. stated that he penetrated her vagina and ejaculated. During the interview, A.S. related that the man had a weapon. When asked by the nurse if her assailant used a condom, A.S. initially told the nurse that the man did have a condom; later, however, when asked to recount the events, A.S. stated that no condom was used.

{¶ 17} Regarding the incident, A.S. informed Jackson that she was "walking from my girl's house and I was cutting through the alley so nobody would see me and think I was a working girl. When I got to Parsons and Welch and I was about to cut through the alley, that's when I saw him." (Tr. Vol. II at 42.) A.S. related that her assailant was "standing by the funeral home and yelled after me and asked, 'What are you doing out here, are you working.' I told him, no, I wasn't and to leave me alone." A.S. stated she "went into the alley and then I heard what sounded like sprinting and he was behind me. He grabbed me by my hair and my sweatshirt and dragged me behind this house. He was whaling on me." (Tr. Vol. II at 43.) A.S. further stated: "He hit me all up and down my back. He hit me in the face and head. I was kind of foggy from being hit so hard." (Tr. Vol. II at 43-44.) A.S. told the nurse that the man then ripped off her coat, pants, and shoes. A.S. further related: "He ripped my bra in half. He jerked me by my legs from behind so I would be on my knees and he raped me doggy style (clarifies rape as his penis

into her vagina). He came in me, no condom. He pulled out and tried to wipe it off." (Tr. Vol. II at 44.)

{¶ 18} At trial, Jackson identified photographs taken of A.S. at the time of the examination. Jackson noted injuries to A.S.'s face and mouth, including redness, swelling and bruising, as well as swelling to her hand and redness to both legs.

{¶ 19} Logan Schepeler, a forensic scientist with the Ohio Bureau of Criminal Investigation ("BCI"), tested the rape kit that the Columbus Police Department submitted to BCI as part of the investigation. According to Schepeler, "semen was identified from the vaginal and perianal samples from the rape kit." (Tr. Vol. II at 100.) A single sperm cell was also collected from the underwear of A.S., and semen was obtained from a condom collected at the scene.

{¶ 20} Devonie Herdeman, a forensic scientist with BCI, performed DNA analysis with respect to samples submitted from A.S. and appellant. Herdeman testified that the BCI laboratory "tested the vaginal and perianal samples and those were found to be a mixture of [A.S.] as well as Frederick Madden." (Tr. Vol. II at 142.) Testing performed on a condom found at the scene revealed a mixture for A.S. and an unknown male.

{¶ 21} Following deliberations, the jury returned verdicts finding appellant guilty of rape, felonious assault, and kidnapping. The trial court made a separate finding of guilt with respect to the repeat violent offender specification. By entry filed March 17, 2016, the trial court sentenced appellant to a total of 39 years incarceration, and the court adjudicated him a Tier III sex offender.

{¶ 22} On appeal, appellant sets forth the following three assignments of error for this court's review:

> I. The prosecutor denied Madden his right to a fair trial and an impartial jury, by asserting that the only eyewitness to the events Madden was being prosecuted for, was "credible," "believable," and "reliable," and by inundating the jury with references to her as the "victim" during trial.
>
> II. Madden's convictions should be reversed because Appellant's trial counsel was deficient at trial, with resulting prejudice.
>
> III. Prosecutorial misconduct through vouching and saturating the trial with references to his key witness as the

"victim,"    linked    with    defense    counsel's    ineffective performance, resulted in cumulative error.

{¶ 23} Under the first assignment of error, appellant argues the prosecutor engaged in misconduct by improperly referring to the state's primary witness as a "victim" throughout the trial. Appellant also contends the prosecutor improperly vouched for the credibility of that witness during opening statement.

{¶ 24} In reviewing allegations of prosecutorial misconduct, "the test for appellate courts is whether the prosecutor's conduct was improper, and if so, whether that conduct prejudicially affected the substantial rights of the accused." *State v. McDowell,* 10th Dist. No. 10AP-509, 2011-Ohio-6815, ¶ 33. A claim of prosecutorial misconduct "will not be grounds for reversal unless the defendant has been denied a fair trial." *Id.* A reviewing court considers allegations of prosecutorial misconduct "in the context of the entire trial." *State v. Muhleka,* 2d Dist. No. 19827, 2004-Ohio-1822, ¶ 84. Further, "[w]here it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and the conviction will not be reversed." *Id.*

{¶ 25} At the outset, we note that defense counsel did not object to any of the comments claimed by appellant to be improper. Accordingly, appellant has "waived any error on that issue on appeal except for plain error." *McDowell* at ¶ 34. In order "to be 'plain' within the meaning of Crim.R. 52(B) an error must: (1) be a deviation from a legal rule; (2) be plain or obvious, i.e., an obvious defect in the trial proceedings; and (3) have affected a substantial right in that it affected the outcome of the trial." *Id.*

{¶ 26} Appellant first contends the prosecutor engaged in misconduct by consistently referring to A.S. as the "victim." Appellant cites to various pages of the trial transcript in which a reference to victim is made.

{¶ 27} A review of the record indicates that the majority of the references to "victim" cited by appellant were not made by the prosecutor but, rather, by law enforcement officers testifying about the investigation. Specifically, the references at issue occurred during the testimonies of Officers Gibson, Christopher Hostettler, and Detective Hedrick. By way of example, Officer Gibson testified that he responded to the scene in which "a female * * * had been severely assaulted. We responded to that scene and made contact with the caller and the female victim at that time." (Tr. Vol. I at 48.)

Similarly, Officer Hostettler testified that he responded to the scene and spoke with a "male and to the victim." (Tr. Vol. I at 90.) Detective Hedrick, when discussing in general how he becomes involved in an investigation, testified that "[a] lot of times victims will go to the hospital on their own and we will respond directly to the hospital." (Tr. Vol. II at 217-18.)

{¶ 28} A review of the record indicates that, in context, the law enforcement officers in most of the instances were referring to the "victim" as a complainant. We also note there was no dispute that the individual at issue, A.S., had suffered physical harm, including a broken jaw, as a result of the incident. As noted by plaintiff-appellee, the State of Ohio, defense counsel acknowledged this fact during opening statement, stating to the jury that A.S. was taken to Grant Hospital on the morning of January 30, 2015. Defense counsel further stated: "She was beat up. There's no question about it. We're going to agree and stipulate her physical and medical evidence." (Tr. Vol. I at 39.)

{¶ 29} While the majority of the references to "victim" were made by law enforcement personnel, we note several instances in which the prosecutor utilized the term "victim." For instance, in questioning Detective Hedrick about his general investigative procedures, the prosecutor inquired: "So is that what you do, you go and interview the victim for the first time?" (Tr. Vol. I at 219.) The prosecutor further inquired: "Do you often then end up interviewing the victim for a second time at some point in your investigation?" (Tr. Vol. I at 220.)

{¶ 30} This court has noted that "[a] 'victim' is a 'person harmed by a crime, tort, or other wrong.' " *State v. Morock,* 10th Dist. No. 14AP-559, 2015-Ohio-3152, ¶ 25, citing *Black's Law Dictionary* (10th Ed.2014). Similarly, it has been held that use of the term " 'victim' is not the same as expressing an opinion that the defendant was guilty of a crime; the term 'victim applies to anyone who suffers either as a result of ruthless design or incidentally or accidentally.' " *State v. Chism,* Wash.App. No. 54895-6-I (Dec. 27, 2005), quoting *Webster's Third New International Dictionary* 2550 (1993).

{¶ 31} Courts in other jurisdictions have held that "[t]he term 'victim' is used appropriately during trial when there is no doubt that a crime was committed and simply the identity of the perpetrator is in issue." *Jackson v. State,* 600 A.2d 21, 24 (Del.1991). *See also In re Welfare of P.J.K.,* Minn.App. No. A15-0115 (Sept. 8, 2015) (where issue at trial was not whether an armed robbery actually occurred but, rather, whether the state

could prove beyond a reasonable doubt who committed it, occasional reference to individual as "victim" was "accurate and not prejudicial").

{¶ 32} As noted above, most of the references to "victim" in the present case are in the context of law enforcement officers recounting their role in the investigation. Courts have observed that "the term 'victim,' to law enforcement officers, is a term of art synonymous with 'complaining witness.' " *Jackson* at 24-25. Thus, courts have found a lack of prejudice where a law enforcement officer uses the term "victim" in such a manner. *See State v. Frey,* Iowa App. No. 7-205/06-1081 (June 27, 2007) (defense counsel not ineffective in failing to object to use of the term victim where detective "used the term 'victim' as synonymous with the term 'complainant' "); *see also State v. Wigg,* 179 Vt. 65, 70 (2005) (finding harmless error where a law enforcement officer uses the term victim as synonymous with complainant and "never expressed an opinion" that the defendant was guilty); *State v. Harvey,* Wash.App. No. 29513-3-III (Mar. 29, 2012) (questions by prosecutor that elicited police officers to refer to individuals shot as "victims" not improper; "referring to the men who died from gunshot wounds as victims does not amount to opinion testimony").

{¶ 33} Appellant relies on this court's decision in *State v. Almedom,* 10th Dist. No. 15AP-852, 2016-Ohio-1553, in support of his contention that reversible error occurred. That case, however, is distinguishable from the facts of this case. At issue in *Almedom* was whether a crime took place, i.e., whether the defendant had sexual conduct with girls under the age of 13. Further, under the facts of *Almedom,* "the trial court judge consistently referred to the girls as 'victims,' " which this court deemed analogous to "telling the members of the jury that the girls were truthful when they claimed that sexual abuse occurred." *Id.* at ¶ 2. By contrast, in the present case there was no dispute that A.S. was physically assaulted and seriously injured, and the record contains no victim references by the trial court.

{¶ 34} Here, where the fact of an assault was not in dispute, and where the witnesses used the term "victim" as synonymous with complainant and did not express an opinion as to appellant's guilt, the record does not show plain error as a result of the references to "victim" during the testimony of law enforcement officers. *See, e.g., Jackson* at 24-25; *Wigg* at 70. Nor is there any indication from the record that the prosecutor intentionally sought to elicit prejudicial testimony from the witnesses at issue. Similarly,

the several isolated instances in which the prosecutor referenced the term "victim," in context, did not infer that appellant committed a crime against A.S. but, rather, reflected the undisputed fact that A.S. suffered a harm. *See Morock* at ¶ 25. *See also Agee v. State,* 544 N.E.2d 157, 159 (Ind.1989) ("it cannot be said that the use of the word 'victim' by the prosecutor on several occasions was done vindictively but was only an inadvertent manner of speaking as might be done to characterize any person who had experienced a mishap").

{¶ 35} Appellant also contends the prosecutor improperly vouched for the credibility of A.S. during opening statement. Specifically, at issue are the following comments by the prosecutor:

> And what you're going to hear is that a woman named [A.S.] -- you'll meet her tomorrow -- she was walking I'm going to call it home late at night. I'm using the word "home" loosely because she's not a person who always has a home. She sleeps where she can. She stays with people when she can. She's not as stable as we all fortunately are lucky enough to be. But she's going to be reliable. She's going to be credible. She's going to be believable.

(Tr. Vol. I at 35.)

{¶ 36} In response, the state argues that the prosecutor was not suggesting the jury should convict appellant because of the prosecutor's belief that A.S. was credible; rather, the state maintains, the prosecutor was simply stating that the evidence would prove A.S. to be a credible witness. Of significance, the state contends, was the fact the prosecutor framed the comments in the future tense, i.e., A.S. "is going to be" reliable, credible, and believable.

{¶ 37} Under Ohio law, "[i]t is improper for an attorney to express a personal belief or opinion as to the credibility of a witness." *State v. Jackson,* 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 117. However, "[a] prosecutor's statement on witness credibility is not an improper voucher where it neither implies knowledge of facts outside the record nor places the prosecutor's personal credibility at issue." *State v. Miller,* 4th Dist. No. 06CA11, 2007-Ohio-427, ¶ 24, citing *State v. Keene,* 81 Ohio St.3d 646, 666 (1998).

{¶ 38} On review, we do not construe the prosecutor's statements during opening as expressing his own opinion as to the credibility of the witness or implying knowledge of facts outside the record. As noted by the state, the phrasing employed, i.e., "going to be"

reliable, etc., arguably indicates the prosecutor was anticipating, based on the evidence to be presented, that the witness would prove to be credible.

{¶ 39} Even accepting the comments to be improper, however, we are unable to conclude that the comments at issue affected the outcome of the trial. Here, considering the record as a whole, the comments were isolated, and the trial court instructed the jury that they "must not consider as evidence any statement of any attorney made during the trial." (Tr. Vol. I at 30.) The trial court also informed the jurors: "[Y]ou have the sole and exclusive duty to decide the credibility of witnesses. This means that it is you who must decide whether to believe or disbelieve particular witnesses." (Tr. Vol. I at 31.) Finally, the trial court instructed the jury that "opening statements are not evidence." (Tr. Vol. I at 33.)

{¶ 40} Finding no plain error affecting appellant's substantial rights, the first assignment of error is not well-taken and is overruled.

{¶ 41} Under his second assignment of error, appellant raises a claim of ineffective assistance of counsel. Specifically, appellant contends his trial counsel was ineffective in failing to object to comments by the prosecutor during opening statement vouching for the complaining witness, and in failing to object to the prosecutor's repeated references to that witness as a victim. Appellant also argues deficient performance by trial counsel in failing to object to the introduction of hearsay testimony of the state's complaining witness, and to the prosecutor's introduction of inflammatory testimony as to why A.S. left the courtroom during the middle of her testimony.

{¶ 42} Under Ohio law, performance of trial counsel will not be deemed ineffective unless and until such performance "is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley,* 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. Further, in order to show a defendant has been prejudiced by his or her counsel's deficient performance, "the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *Id.* at paragraph three of the syllabus.

{¶ 43} Appellant's first two claimed instances of ineffective assistance of counsel (i.e., trial counsel's failure to object to the prosecutor's remarks during opening statement, and the failure to object to references to the term "victim" during the testimony of law

enforcement officers) implicate issues previously addressed under the first assignment of error in considering appellant's claims of prosecutorial misconduct. Having found that the prosecutor did not improperly vouch for the witness during opening statement or that such comments affected the outcome of the trial, appellant cannot demonstrate ineffective assistance of counsel based on trial counsel's failure to object to those remarks.

{¶ 44} Similarly, in addressing appellant's claim of prosecutorial misconduct with respect to references at trial to the complaining witness as a "victim," we found no plain error. As noted, the majority of the references were in the context of law enforcement officers referring to the complainant as a victim, and the evidence was undisputed that A.S. suffered physical injury as a result of the incident. Under these circumstances, counsel's failure to object did not constitute deficient performance. *See Morock* at ¶ 25 (where evidence showed individual suffered a wrong, trial counsel was not ineffective in failing to challenge use of word "victim" by prosecutor and witness).

{¶ 45} Appellant also claims that his trial counsel was ineffective in failing to object to inadmissible hearsay evidence; specifically, purported statements of A.S. made during the testimony of Officer Gibson, the first officer dispatched to the scene. Appellant argues that the prosecutor adduced testimony from the officer describing the substance of A.S.'s allegations, i.e., that a male had forced her to the back of an unknown location, hit her several times, and raped her. Appellant contends the statements were inadmissible hearsay because the officer was testifying to out-of-court statements made by the complaining witness to prove the truth of the matter asserted.

{¶ 46} In response, the state argues the officer's testimony was not offered to prove that A.S.'s out-of-court statements were true but, rather, to explain the officer's conduct in looking for evidence at the abandoned house and to reveal how the sexual assault squad became involved in the investigation. The state further argues that, had an objection been made, the state likely would have been able to establish the necessary foundation to admit the statements as excited utterances of a rape victim.

{¶ 47} This court has previously noted that, to the extent a victim's statements are offered to explain the conduct of an officer, such statements are "not admitted for the truth of what the victim stated and are admissible." *State v. Albert,* 10th Dist. No. 06AP-439, 2006-Ohio-6902, ¶ 60. *See also State v. F.R.*, 10th Dist. No. 14AP-440, 2015-Ohio-1914, ¶ 34 ("Generally, a police officer is permitted to testify as to the underlying reasons

for his conduct in investigating a crime, and such statements are, by definition, not hearsay."). Further, as noted by the state, the officer testified that A.S. was "visibly shaken * * * crying, blood on her face" at the time. (Tr. Vol. I at 52.) Arguably, based on the record presented, it is not clear that the trial court would have sustained an objection to the testimony at issue. *See, e.g., State v. Nixon,* 12th Dist. No. CA2011-11-116, 2012-Ohio-1292, ¶ 14 (where evidence indicated declarant "was shaken and scared" when she spoke with officer shortly after officer arrived at scene, oral statement made to officer was properly admissible as an excited utterance); *State v. Johnson,* 8th Dist. No. 81692, 2003-Ohio-3241, ¶ 31 (finding that "both victims' statements were excited utterances" where officers testified that these individuals were "visibly shaken and frightened" when police arrived).

{¶ 48} Even assuming, however, that the trial court may have sustained objections to the statements, appellant cannot demonstrate prejudice, i.e., that the outcome of the trial would have been different. It has been noted that "hearsay is generally inadmissible because the declarant is not testifying in court and the factfinder is unable to observe the declarant and decide whether the declarant's statement is worthy of belief." *State v. Warren,* 8th Dist. No. 83823, 2004-Ohio-5599, ¶ 44. In the instant case, both the officer and declarant, A.S., testified at trial and A.S. was subject to cross-examination. *See Cleveland v. Arnold,* 8th Dist. No. 98693, 2013-Ohio-1791, ¶ 20 (holding that, even had defense counsel objected to officer's testimony as to what he learned through interview of witness, outcome of trial would not have been different where same evidence defendant claims of as being improper hearsay evidence was admitted properly through the actual declarants at trial). *See also State v. Bartolomeo,* 10th Dist. No. 08AP-969, 2009-Ohio-3086, ¶ 17 (appellant failed to demonstrate plain error regarding admission of alleged hearsay testimony where declarant testified at trial "and her testimony, which during direct examination was to the same effect as the officer's statements, was subject to cross-examination").

{¶ 49} Appellant also contends his trial counsel was ineffective in failing to object to the prosecutor's inquiry of A.S. as to why she abruptly left the courtroom during her testimony. Appellant argues that the response by A.S. was irrelevant and inflammatory.

{¶ 50} By way of background, during the direct testimony of A.S., the record indicates that A.S. addressed appellant and stated: "Can you please quit staring at me."

The trial court immediately interjected and called for a five-minute recess. A.S. responded: "Please. I'm going to be sick." The transcript reflects that A.S. "[ran] out of the courtroom." (Tr. Vol. I at 110.) After A.S. returned to the courtroom, but outside the presence of the jury, the trial court instructed the witness to not focus on appellant but, instead, to focus on counsel and the questions being asked.

{¶ 51} The jury then returned to the courtroom and the prosecutor resumed the direct examination of A.S. The prosecutor initially asked A.S. if she was "[f]eeling better," and A.S. responded "[a] little bit." In response to a further inquiry by the prosecutor, A.S. related that she had run to the bathroom, and that she "[t]hrew up." (Tr. Vol. I at 114.)

{¶ 52} Appellant contends defense counsel should have objected at the onset of the prosecutor's inquiry, or should have moved to limit such questioning before A.S. took the stand. Appellant maintains that, having failed to do either, the jury was permitted to hear emotionally charged testimony.

{¶ 53} On review, we do not find that counsel acted unreasonably in failing to object to the inquiry by the prosecutor. As noted, the trial court immediately called a recess to allow the witness to leave the room and compose herself, and the court admonished the witness, upon returning to the courtroom, to focus on the questions of counsel. Defense counsel may have deemed the actions by the trial court adequate under the circumstances, and counsel may have made a tactical decision not to object to the response of A.S. to avoid drawing further attention to the remark. We also note that the trial court instructed the jury that their decision "must not be influenced * * * by sympathy, prejudice, or passion towards any party, witness or attorney in this case." (Tr. Vol. I at 30.) *See, e.g., State v. Hill,* 75 Ohio St.3d 195, 205 (1995) (noting, in finding no evidence that emotional outburst by victim's mother deprived defendant of fair trial, that trial court "instructed the jury not to be influenced by sympathy or prejudice").

{¶ 54} Moreover, the record fails to suggest the brief exchange had any effect on the verdict. *See, e.g., State v. Greer,* 8th Dist. No. 91983, 2009-Ohio-4228, ¶ 84 (defense counsel not ineffective in failing to request mistrial following emotional outburst where "no indication that the result of the trial would have been different had the jury not heard [decedent's grandmother's] outburst"). Accordingly, having failed to demonstrate deficient performance, or a reasonable probability that the outcome of the trial would

have been different had counsel objected, appellant cannot prevail as to his claim of ineffective assistance of counsel.

{¶ 55} Appellant's second assignment of error is overruled.

{¶ 56} Under his third assignment of error, appellant contends that cumulative error resulted in an unfair trial. Specifically, appellant argues that prosecutorial misconduct through vouching and saturating the trial with references to "victim," along with defense counsel's ineffective performance, resulted in cumulative error. We disagree.

{¶ 57} Pursuant to the doctrine of cumulative error, "a conviction will be reversed when the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of the errors does not individually constitute cause for reversal." *State v. Pyles,* 7th Dist. No. 13 MA 22, 2015-Ohio-5594, ¶ 103, citing *State v. Garner*, 74 Ohio St.3d 49, 64 (1995). However, the cumulative error doctrine "does not apply to cases that are not marked by multiple instances of harmless error." *State v. Banks,* 10th Dist. No. 03AP-1286, 2005-Ohio-1943, ¶ 23, citing *Garner.*

{¶ 58} We have previously found no plain error as a result of the prosecutor's comments during opening statement or to "victim" references made at trial. Nor did we find deficient performance or prejudice resulting from defense counsel's failure to object to the testimony of Officer Gibson, or to the prosecutor's inquiry as to why A.S. abruptly left the courtroom. Having found "no prejudicial error and no justification for the invoking of plain error," there can be "no cumulative effect of errors that would warrant a conclusion that defendant was denied a fair trial." *State v. Blackmon,* 10th Dist. No. 94APA05-773 (Feb. 14, 1995).

{¶ 59} Appellant's third assignment of error is not well-taken and is overruled.

{¶ 60} Based on the foregoing, appellant's three assignments are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

BRUNNER and HORTON, JJ., concur.

————————————