[Cite as *State v. Jackson*, 2023-Ohio-455.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,          :

                                      No. 111602

    v.                           :

ROMALAS L. JACKSON,                      :

    Defendant-Appellant.         :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED AND REMANDED
**RELEASED AND JOURNALIZED:** February 16, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-645572-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Timothy R. Troup and Eben O. McNair, Assistant Prosecuting Attorneys, *for appellee.*

The Law Office of Jaye M. Schlachet and Eric M. Levy, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, Romalas L. Jackson ("Romalas"), appeals his convictions and sentence and claims the following errors:

> 1. Appellant was denied his constitutional right to a fair trial due to several instances of prosecutor misconduct.

2. The trial court erred in its jury instructions that made incorrect statements of law.

3. The trial court erred in denying appellant's request to continue trial to hire new counsel and in having appellant proceed forward with trial being represented by retained counsel that appellant terminated or sought to terminate.

4. Appellant's convictions must be reversed where the state of Ohio failed to present sufficient evidence to support the convictions.

5. Appellant's convictions are against the manifest weight of the evidence.

6. Appellant's convictions were due to the ineffective assistance of counsel.

7. Appellant's indefinite sentence imposed under the Reagan Tokes sentencing scheme violates his rights under the United States Constitution and appellant's sentence is contrary to law where the trial court failed to comply with the required notices contained in R.C. 2929.19(B)(2)(c) when imposing sentence.

{¶ 2} We affirm Romalas's convictions and remand the case to the trial court for the limited purpose of providing Romalas with each of the notifications required by R.C. 2929.19(B)(2)(c).

## I. Facts and Procedural History

{¶ 3} In November 2019, Romalas was charged with one count of rape, in violation of R.C. 2907.02(A)(2), as alleged in Count 1, and one count of domestic violence, in violation of R.C. 2919.25(A), as alleged in Count 2. The rape charge contained notice of prior conviction and repeat-violent-offender specifications. The domestic-violence charge contained a furthermore clause, alleging that Romalas had previously been convicted of domestic violence.

{¶ 4} Romalas waived his right to a jury trial with respect to the domestic-violence charge alleged in Count 2 and with respect to the specifications alleged in Count 1. The rape charge was tried to a jury.

{¶ 5} The victim, M.T., testified that she worked as a home-health aid and met Romalas when she was assigned to care for Romalas's grandmother. M.T. and Romalas dated on and off, but they were together in M.T.'s apartment on the night of October 27, 2019, where the events giving rise to this case occurred.

{¶ 6} M.T. explained that after she and Romalas had eaten dinner, Romalas suggested they "take a nap." However, Romalas, who was searching through M.T.'s phone, discovered that she had accepted a "friend request" from one of his male friends on Facebook, and he reacted violently. M.T. explained:

> Q: Okay. So I want to go right to when the defendant discovered the text messages on your cell phone. Tell us how he reacted.
>
> A: Real violent. He said, Oh, so you're f---ing one of my friends. We grew up in the same neighborhood, you're f---ing one of my friends. And I said, I don't even know him. And then he just started smacking me around.

(Tr. 281.)

{¶ 7} Romalas and M.T. moved into the bathroom where Romalas called the male friend, while he continued to beat M.T. M.T. explained:

> Q: At that point when we was in the bedroom — I mean, bathroom, I was crying, you know. I was very scared. I thought he was going to kill me.
>
> So, you know, we went into the bedroom and I told him, I want to go to my sister house. He closed the door and said I'm not going nowhere. Then I started crying. Then he was like, so since you want to f--k my

friend, you going to f--k me. So he pushed me on the bed and he pulled my pants off, and he forced his self on me.

Q: Did you say anything to him?

A: Yes. I told him no. I don't want to have sex.

Q: Do you remember how many times you told him no?

A: Twice.

Q: Did he stop?

A: No.

(Tr. 284.) According to M.T., Romalas then penetrated her vagina with his penis. (Tr. 285.) When asked whether she physically resisted the assault, M.T. testified that she did not resist "[b]ecause [she] was scared he was going to beat [her] up more." (Tr. 285.)

{¶ 8} M.T. testified that after Romalas raped her, she took a shower and left the house under the guise of going to the store to buy cigarettes. (Tr. 286.) Although M.T. lived in Bedford Heights, she went to the Warrensville Heights Police Department to report the rape because she had reported Romalas to the Bedford Heights Police Department on several prior occasions and she was embarrassed to report yet another incident to them. The Warrensville Heights police told her that she had to report the crime to Bedford Heights police.

{¶ 9} Officer Javon Jackson ("Officer Javon") testified that he spoke with M.T. at the Bedford Heights police station and took both an oral and written statement from her. Officer Javon's interactions with M.T. were recorded on his body camera, and video of the interaction was played in open court for the jury. After taking M.T.'s

statements, Officer Javon told M.T. to go to the Cleveland Clinic to obtain a sexual assault examination. (Tr. 325.)

{¶ 10} Molly Jackson ("Nurse Molly"), a sexual-assault nurse examiner ("SANE"), testified that she examined M.T. at Hillcrest Hospital on October 27, 2019. M.T. told Nurse Molly what happened to her, and Nurse Molly recorded the account in the "narrative portion" of M.T.'s medical record. (Tr. 373.) Reading M.T.'s statement, as recorded in the narrative summary, Nurse Molly stated, in part:

> He looked at my phone and seen that a friend from the neighborhood sent me Facebook request and I accepted it. He saw — he saw it and started spitting, yelling, cussing me out, you know, hitting me. I got up from the bed and said I was going to go over to my sister's house. He said no, you're not doing that. We were both sitting on the bed and he hit me. He hit my head against the wall. For two hours straight I sat on the bed and listened to him yell at me and cuss me out. He said, Pull [sic] your pants down. I said, No, I don't want to have sex with you. I was standing up. He pushed me onto the bed. I kept telling him, I don't want to have sex with you. He pulled my pants down and he got on top of me and started having sex with me.
>
> * * * After sex he said that he was sorry. I told him that I was going to shower. When I got out of the shower, I told him I was going to buy him some cigarettes. He let me go * * * .

(Tr. 374-375.)

{¶ 11} Nicole Rivera ("Rivera"), a forensic scientist with the Ohio Bureau of Criminal Investigation ("BCI"), testified as an expert in the field of forensic DNA analysis. She testified that vaginal swabs collected as part of the rape examination tested positive for acid phosphatase activity, which indicated the presence of semen. Rivera also concluded that Romalas was a contributor to a mixture of DNA taken in another sample. (Tr. 338-340.)

{¶ 12} Sergeant Brian Williams ("Williams") of the Cuyahoga County Sheriff's Office, testified that he reviewed a number of recorded telephone calls made by Romalas while he was in the county jail awaiting trial. In a call placed on October 30, 2019, which was played for the jury, Romalas is heard admitting that when he saw the friend request on M.T.'s phone, he "snapped" and "lost [his] f---ing mind." He admits that he hit M.T. "three or four times" and that she was "crying." (State's exhibit No. 12.) He also admits that when he told M.T. to take her pants off, she said "no," and he "pulled her pants off." (State exhibit No. 12.) Finally, he admits that he "f---ed her at the end of the bed." (State ex. No. 12.)

{¶ 13} Based on the evidence presented at trial, the jury found Romalas guilty of one count of rape, and the trial court found him guilty of one count of domestic violence and of the notice-of-prior-conviction and repeat-violent-offender specifications. At the sentencing hearing, the trial court first sentenced Romalas to two years in prison for a probation violation arising from a prior case. The court then sentenced Romalas to ten years on the rape conviction and two years on the domestic-violence conviction, to be served consecutively. Pursuant to the Reagan Tokes Law, the trial court imposed a minimum sentence of 13 years and six months to a maximum of 18 years and six months. The trial court awarded Romalas 942 days of jail-time credit and advised him that upon his release from prison, he will be subject to five years of mandatory postrelease control. This appeal followed.

## II. Law and Analysis

## A. Prosecutorial Misconduct

{¶ 14} In the first assignment of error, Romalas argues his constitutional right to a fair trial was violated by several instances of prosecutorial misconduct. He contends the two prosecutors who represented the state at trial asked several improper questions and made inappropriate comments that prejudiced the jury against him.

{¶ 15} The test for prosecutorial misconduct is whether the prosecutor's "'remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant.'" *State v. Hessler*, 90 Ohio St.3d 108, 125, 734 N.E.2d 1237 (2000), quoting *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984). "To demonstrate prejudice in this context, 'defendant must show that the improper remarks or questions were so prejudicial that the outcome of the trial would clearly have been otherwise had they not occurred.'" *State v. Obermiller*, 147 Ohio St.3d 175, 2016-Ohio-1594, 63 N.E.3d 93, ¶ 105, quoting *State v. Collier*, 8th Dist. Cuyahoga No. 78960, 2001 Ohio App. LEXIS 4663 (Oct. 18, 2001).

### 1. "Voir Dire"

{¶ 16} Romalas first contends the prosecutors improperly questioned members of the jury regarding their understanding of the phrase "no means no." Romalas did not object to the prosecutor's questions and, therefore, forfeited all but plain error. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 3, 21 (Failure to object to an error in the trial court forfeits all but plain error on appeal.). Crim.R. 52(B) authorizes appellate courts to correct "'[p]lain errors or defects affecting

substantial rights' notwithstanding the accused's failure to meet his obligation to bring those errors to the attention of the trial court." *Id.* at ¶ 22, quoting Crim.R. 52(B). To prevail under a plain-error analysis, the appellant bears the burden of demonstrating that, but for the error, the outcome of the trial would clearly have been different. *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, 873 N.E.2d 306, ¶ 17.

{¶ 17} "'The purpose of voir dire examination of jurors is to determine the real state of their minds so that a fair and impartial jury can be chosen.'" *State v. Anderson*, 30 Ohio St.2d 66, 70, 282 N.E.2d 568 (1972), fn. 1, quoting *Evans v. Mason*, 82 Ariz. 40, 46, 308 P.2d 245 (1957). In *Vega v. Evans*, 128 Ohio St. 535, 191 N.E. 757 (1934), the Ohio Supreme Court explained that the scope of voir dire inquiry

> will not be confined strictly to the subjects which constitute grounds for the sustaining of a challenge for cause; but if it extends beyond such subjects it must be conducted in good faith with the object of obtaining a fair and impartial jury and must not go so far beyond the parties and the issues directly involved that it is likely to create a bias, a prejudice, or an unfair attitude toward any litigant.

*Id.* at paragraph two of the syllabus, citing *Pavilonis v. Valentine*, 120 Ohio St. 154, 165 N.E. 730 (1929).

{¶ 18} "'Questions on voir dire must be sufficient to identify prospective jurors who hold views that would prevent or substantially impair them from performing the duties required of jurors.'" *Hunt v. E. Cleveland*, 8th Dist. Cuyahoga No. 105953, 2019-Ohio-1115, ¶ 32, quoting *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 57. To that end, counsel is afforded wide latitude in determining how to

best conduct voir dire. *State v. Bates*, 159 Ohio St.3d 156, 2020-Ohio-634, 149 N.E.3d 475, ¶ 31; *Krupp v. Poor*, 24 Ohio St.2d 123, 125, 265 N.E.2d 268 (1970).

{¶ 19} "Inquiries designed to determine if the juror will be unbiased and will vote in accordance with law are permissible, and such inquiries may form a basis for removal under R.C. 2313.42(J)."[1] *State v. Saxton*, 9th Dist. Lorain Nos. 02CA008029 and 02CA008030, 2003-Ohio-3158, ¶ 46 (Holding that prosecutor's "long line of questioning regarding the jurors' feelings on voting in accordance with the law, especially a law wherein the government is imposing regulations upon license holders which may be onerous or seem unfair" was proper.).

{¶ 20} During voir dire, the following discussion occurred:

[PROSECUTOR]: * * * What do you think I mean * * * by that when I say, no means no.

JUROR NO. 10: No. If someone asks you to do something or tries to do something to you and you say no, it means no. You have to respect that.

[PROSECUTOR]: * * * Juror Number 6, let me ask you, do you think that no means no even when the person saying no is the one who started that encounter? So someone initiates sex; can the person who initiates a sexual encounter still be raped if they change their mind partway through and say no.

JUROR NO. 6: Yes.

* * *

[PROSECUTOR]: Show of hands, how many people agree with that proposition, that no means no even if you start it? * * *

---

[1] This section governs challenges for cause and was renumbered as R.C. 2313.17 by 2012 H.B. 268, Section 1, effective May 22, 2012.

So Juror Number 5, let me start with you. Do you have some hesitancy about that concept or were you just — did it take you minute to follow everything we were saying?

JUROR NO. 5: No, I was processing what you were saying * * * . So no always means no, but I don't know when that no came, if it was after something occurred. I need to be honest about where my head goes.

[THE PROSECUTOR]: That's a very fair point. At this stage of the proceedings I'm not really allowed to talk to you about this specific evidence that you might hear in this case. I'm just kind of allowed to ask about general legal concepts.

So could you explain your thought process a little more to me?

JUROR No. 5: I think no always means no and that should always be respected. As you were saying it to me and you qualified it as a sexual encounter for the person that started it, that to me is irrelevant. I don't know when the no is said in the course of what is going on. I don't know what was going on once the word no was yelled. Does that make sense? Or even not yelled, said.

[PROSECUTOR]: I think it does. You hit on a couple things there and I want to unpack those. So let me ask you this first. Would you agree that once someone does say no, if there is sex after that, that is not okay, that is unlawful?

JUROR NO. 5: Correct.

[PROSECUTOR]: We probably call that rape.

JUROR NO. 5: I agree with that.

[PROSECUTOR]: How many people agree with that notion? Everyone, okay.

(Tr. 181-183.)

{¶ 21} Romalas argues the prosecutor's statements and questions regarding "no means no" constituted a misstatement of the law that prejudiced him. Indeed, lack of consent is not an element of rape under Ohio law. *See* R.C. 2907.02(A)(2); *State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 27 (2d Dist.). However, proof of physical

resistance is not required to prove rape under Ohio law. R.C. 2907.02(C) ("A victim need not prove physical resistance to the offender in prosecutions under this section."). Thus, lack of consent is relevant to determining whether the defendant compelled the victim with force or a threat of force. *State v. El-Berri*, 8th Dist. Cuyahoga No. 89477, 2008-Ohio-3539, ¶ 57 (Stewart, J., dissenting.). The prosecutor's questions regarding the phrase "no means no" were designed to uncover any juror biases and to explore the jurors attitudes about rape.

{¶ 22} Moreover, defense counsel had an equal opportunity to question the jury on any alternative perspectives on the issue of consent. Defense counsel was also free to question the jury regarding their understanding that the judge, not counsel, provides instructions on the law. If defense counsel determined that any juror was biased and unable to follow the court's instructions on the law, he or she could exercise a peremptory challenge to remove the juror. We, therefore, find no misconduct regarding the prosecutor's voir dire questions.

### 2. Terms "Victim" and "Survivor"

{¶ 23} Romalas next argues the prosecutor engaged in misconduct throughout the trial by referring to M.T. as "the victim" and "a survivor." However, again, because Romalas failed to object to these terms at trial, he forfeited all but plain error. *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 3, 21.

{¶ 24} Romalas cites *State v. Almedom*, 10th Dist. Franklin No. 15 AP-852, 2016-Ohio-1553, in support of his argument. In *Almedom*, the Tenth District Court of Appeals found that the defendant had ineffective assistance of counsel because his trial

counsel failed to object to the trial court's repeated references to the complaining witness as "the victim" even before any witness testified. *Id*. at ¶ 6, 11. The Tenth District found that the defendant was prejudiced by the inappropriate references because "[t]he trial court judge, who is viewed as the ultimate authority figure in the courtroom, in essence told the jury more than once that Almedom had victimized three young girls." *Id*. at ¶ 11.

{¶ 25} In contrast to *Almedom*, where the judge made the prejudicial comments, the references at issue in this case were made by the prosecutors and witnesses, who are not "ultimate authority figure[s] in the courtroom." *Id*. Unlike judges, who must remain neutral, the jury is aware that prosecutors and witnesses have biases. Therefore, *Almedom* is inapplicable to the facts of this case.

{¶ 26} This court has held that a prosecutor's or a witness's use of the term "victim" to refer to a complaining witness does not rise to the level of plain error. *State v. Butts*, 8th Dist. Cuyahoga No. 108381, 2020-Ohio-1498. *See also State v. Madden*, 2017-Ohio-8894, 100 N.E.3d 1203, ¶ 26-34 (10th Dist.) (Witnesses did not express an opinion as to the defendant's guilt by using term "victim" as synonymous with "complainant.").

{¶ 27} In *Butts*, the defendant in a rape case argued the prosecutor and a witness improperly referred to the complaining witness as a "survivor" and "victim." The defendant argued the terms were "prejudicial in that they connote pre-judgment and create sympathy for the complainant." *Id*. at ¶ 38. We rejected this argument and held that use of the terms "survivor" and "victim" did not rise to the level of plain error even

though they were used to describe the complaining witness because the outcome would not have been different if those terms were not used due to the overwhelming evidence of defendant's guilt.

{¶ 28} As in *Butts*, the prosecutor used the terms "survivor" and "victim" when speaking of the process of investigating rape cases generally and with respect to the investigation of M.T.'s complaint in particular. In questioning Officer Javon, the prosecutor asked, "Your training touches on that, but when a survivor comes in you really need to send them to a specialist; is that fair to say?" The prosecutor also asked, "When you are speaking to a rape survivor, particularly when you're speaking to [M.T.], is it your job as the initial officer to get all the details out of her that you might later need to get, or do you just really take an initial statement and then later she'll come in and meet with someone like Detective Payne[?]" (Tr. 326.)

{¶ 29} The prosecutor also used the term "rape survivor" when questioning Nurse Molly to refer to patients she examined in her position as a SANE nurse. For example, the prosecutor stated, "You mentioned sometimes rape victims or sexual assault survivors are under the influence of drugs or alcohol." (Tr. 369.) The prosecutor also asked, "What is the purpose of soliciting that narrative, the version of events from the rape survivor?" (Tr. 370.) Thus, Nurse Molly was referring to rape victims in a general sense in discussing her work as a SANE nurse. On other occasions, Officer Javon and Detective Payne referred to "victims" in the context of rape investigations generally.

{¶ 30} In *Madden*, the court observed that law enforcement officers use the term "victim" as a "term of art" synonymous with "complaining witness." *Madden*, 2017-Ohio-8894, 100 N.E.3d 1203, at ¶ 32. It is obvious when discussing the victims of rape generally that the term "victim" refers to the "complaining witness" and that such general references do not unfairly prejudice the defendant in a particular case. Thus, the court in *Madden* concluded that using the term "victim" synonymously to refer to a complaining witness does not result in prejudice to the defendant. *Id*. at ¶ 32. Because the terms "victim" and "survivor" were used to describe complaining witnesses in rape investigations generally, the jury would reasonably infer that the same meaning applied to those terms in relation to M.T., the complaining witness in this case. We, therefore, find no misconduct in the use of those terms under the circumstances of this case.

### 3. Intrusiveness of SANE Examination

{¶ 31} Romalas argues the prosecutors engaged in misconduct by eliciting testimony regarding the intrusiveness of a sexual-assault examination for purposes of inflaming the jury. The prosecutor asked Nurse Molly how intrusive the SANE examination is compared to other kinds of medical examinations. In response, Nurse Molly stated that the SANE examination is a ten on a scale of one to ten in intrusiveness because it forces the patient to relive trauma that brought him or her to the hospital for the examination. (Tr. 383.) Romalas did not object to this testimony and, therefore, forfeited all but plain error. *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 3, 21.

{¶ 32} In *State v. Schoenlein*, 6th Dist. Wood No. WD-17-031, 2018-Ohio-1653, the Sixth District Court of Appeals rejected the argument that "it was improper of the prosecution to elicit testimony from the treating SANE nurse regarding her opinion on the level of physical intrusiveness of a SANE examination" because it inflamed the jury. *Id*. at ¶ 20-23.

{¶ 33} However, even if the testimony was inappropriate, we cannot say that the testimony was so prejudicial that the outcome of the trial would clearly have been different since Romalas admitted that he raped M.T. and his recorded admission was played for the jury. (*See* state's exhibit No. 12.) Moreover, Romalas's description of the rape in the recording was consistent with M.T.'s statement to police, her statement to the SANE nurse, and with her trial testimony. Romalas's recorded statement corroborated M.T.'s testimony regarding the rape. Therefore, the outcome of the trial would not have been different even if the prosecutor had not elicited testimony from Nurse Molly regarding the intrusiveness of the SANE examination.

### 4. Closing Argument

{¶ 34} Finally, Romalas argues the prosecutors committed prosecutorial misconduct during closing argument by (1) commenting on Romalas's failure to testify, (2) commenting on the credibility of defense counsel, (3) commenting on a voir dire promise to find Romalas guilty if it heard evidence that M.T. said "no" to sexual conduct, and by calling Romalas "a rapist."

## a. Failure to Testify

{¶ 35} Romalas contends the prosecutor violated his Fifth Amendment right to remain silent by asserting that Romalas failed to present evidence to rebut the state's case-in-chief. A prosecutor's comments regarding a defendant's refusal to testify at trial violate the accused's Fifth Amendment right to remain silent. *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), syllabus. A "'[p]rosecutors' comments on a defendant's refusal to testify have always been looked upon with extreme disfavor because they raise an inference of guilt from the defendant's decision to remain silent.'" *State v. Morton*, 8th Dist. Cuyahoga No. 109200, 2021-Ohio-581, ¶ 17, quoting *State v. Thompson*, 33 Ohio St.3d 1, 14, 514 N.E.2d 407 (1987).

{¶ 36} Romalas objects to the following remarks made by the prosecutor during closing argument:

> He'd love you to believe that this was some sort of consensual sexual encounter. And on the topic of consent, the evidence that you are to consider comes from this seat. You have not heard one witness provide any evidence that this was consensual. You have not seen one exhibit. You will not have any exhibits with you. Your collective memories will not recall any testimony that this was consensual.

(Tr. 424.) The state did not specifically comment on the fact that Romalas did not testify at trial. It merely asserted that the defense failed to produce any evidence of any kind that the sexual conduct he had with M.T. was consensual. In *Morton*, we explained:

> While direct comment on an accused's failure to testify does violate the Fifth Amendment's self-incrimination clause, "[a] reference by the prosecutor in closing argument to uncontradicted evidence is not a comment on the accused's failure to testify, where the comment is

directed to the strength of the state's evidence and not to the silence of the accused, and the jury is instructed not to consider the accused's failure to testify for any purpose."

*Morton* at ¶ 18, quoting *State v. Ferguson*, 5 Ohio St.3d 160, 450 N.E.2d 265 (1983), paragraph one of the syllabus. In accordance with *Morton* and *Ferguson*, the trial court properly instructed the jury that it is not necessary that the defendant take the witness stand in his own defense. He has a constitutional right not to testify, and the fact that the defendant did not testify must not be considered for any purpose. (Tr. 439.) The prosecutor was merely pointing out that the evidence presented in the state's case-in-chief was uncontradicted. There was, therefore, nothing improper about this statement.

### b. Comments on Defense Counsel and Defendant's Right to Trial

{¶ 37} Romalas argues the prosecutor committed misconduct in closing argument by commenting on defense counsel's character and impermissibly commentating on Romalas's reasons for exercising his right to trial. He objects to the following remarks:

> I've had a couple other cases with [counsel] and one of the things that I appreciate and respect about him is that he is straightforward. And he is very straightforward with you, acknowledging that this is a difficult case, and I think he said something similar in his opening, right? This is a very difficult case, especially from the defense perspective.
>
> And you may naturally wonder, why are we even here? Why is this even in dispute? Sometimes, candidly, the most rational decision for a defendant to make is to play effectively for a fumble, right? Hope that it's been two and half years since this happened, maybe [M.T.] will get cold feet and she won't want to come into court. Maybe we will forget one of the things we need to do, like having witnesses identify the

defendant in court, and maybe we can just play for fumble and maybe we'll get somewhere.

So do not hold that against him. Do not hold his choice to exercise his right to a jury trial against him.

(Tr. 428-429.)

{¶ 38} Despite Romalas's assertion otherwise, the prosecutor did not make any unfair or derogatory remarks about defense counsel. The prosecutor stated that he respected defense counsel for being "straightforward." (Tr. 428.) And the prosecutor's statements about "why are we here" and that the defense was "playing for a fumble" were not alluding to anything not in evidence, nor was it creating an impermissible inference of guilt. The comments reflected the fact that the state's evidence, which included a recorded confession by Romalas, remained completely uncontradicted.

{¶ 39} Moreover, the prosecutor never suggested that the jury should draw any conclusion from Romalas's decision to go to trial. The prosecutor specifically told the jury to "not hold his choice to exercise his right to trial against him." (Tr. 428.) We, therefore, find no misconduct in these statements.

### c. "No Means No."

{¶ 40} Romalas further argues that the prosecutor prejudiced his right to a fair trial by incorrectly asserting that a rape occurred simply because M.T. said "no" to sexual conduct. He contends this was a misstatement of the law.

{¶ 41} In determining whether prosecutorial misconduct occurred in closing argument, the argument must be reviewed in its entirety and "isolated comments by a prosecutor are not to be taken out of context and given their most damaging meaning."

*State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 94, citing *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

{¶ 42} As previously stated, Romalas admitted that he raped M.T. in a recorded phone call that was entered into evidence. (State's exhibit No. 12.) In the recording, Romalas describes all of the events leading up to the rape. He explains how he discovered that M.T. had sent a friend request to one of his male friends on Facebook and that the discovery made him "snap." He admits that he hit M.T. multiple times and that she started to cry. He then told her to take off her pants, and she said, "no." He then pulled her pants off, told her to "spread [her] legs," and he "f---ed her on the end of the bed." There is no evidence that she said no again after refusing to take her pants off. (State's exhibit No. 12.)

{¶ 43} In closing argument, the prosecutor recounted Romalas's admissions in the recorded phone call, stating:

> She got to crying and feeling all hurt. So to cover up for slapping her, I said, let's have sex. So she's crying, she's hurt. What did he say? Bitch, you just got beat down.
>
> * * *
>
> I said, [M.T.] take your pants off. She said no.
>
> Ladies and gentlemen, every single one of you agreed with [the prosecutor], no means no. No always means no. Whatever occurred after she said no the first time, in Ohio we call it rape.
>
> You've agreed that no means no. You've heard all the testimony. We have met our burden, and we will wait for you, ladies and gentlemen, to review this evidence and come back in this courtroom for your guilty verdicts.

(Tr. 424-425.)

{¶ 44} As previously explained, proof of physical resistance is not required to prove rape under Ohio law. R.C. 2907.02(C). Although the absence of consent is not an element of the offense of rape, it is relevant to determining whether the defendant compelled the victim to submit by force or a threat of force because consent would preclude a finding of force.

{¶ 45} Although the prosecutor's argument suggests that the absence of consent, by itself, is enough to establish a rape offense, the trial court specifically instructed the jury that the statements made during closing argument are not evidence. (Tr. 432.) *State v. Robinson*, 8th Dist. Cuyahoga No. 79825, 2002-Ohio-805, 2002 Ohio App. LEXIS 816 (Feb. 28, 2002) ("It is well settled that what counsel says in opening statement and closing argument is not evidence."). Moreover, the jury is presumed to follow the trial court's instructions on the applicable law. *Pang v. Minch*, 53 Ohio St.3d 186, 187, 559 N.E.2d 1313 (1990), paragraph four of the syllabus.

{¶ 46} We, therefore, cannot say that Romalas was prejudiced by the prosecutor's remarks under these circumstances.

### d. "A Rapist"

{¶ 47} Finally, Romalas argues the state prejudiced his right to a fair trial by calling him a rapist. In concluding the closing arguments, the prosecutor stated: "You are sitting in the presence of a rapist. Say so with your verdict." (Tr. 430.)

{¶ 48} "The United States Supreme Court has expressly recognized that prosecutors serve a special role in our justice system requiring them to adhere to the highest standards and to avoid improper arguments, insinuations, and assertions

calculated to mislead the jury." *State v. Fears*, 86 Ohio St.3d 329, 351, 715 N.E.2d 136 (1999) (Moyer, C.J., concurring in part and dissenting in part). We recognize that prosecutors are afforded some latitude in closing arguments and that the prosecutor was asking the jury to find the defendant guilty after having heard the evidence. In this case, the prosecutors conduct, albeit questionable, did not deprive Romalas of a fair trial. Moreover, due to the overwhelming evidence of Romalas's guilt, we find that the comment was not prejudicial.

{¶ 49} The first assignment of error is overruled.

## B. Jury Instructions

{¶ 50} In the second assignment of error, Romalas argues the trial court erred by providing incorrect statements of law in the jury instructions. He contends the court provided an inaccurate definition of the term "purposely." Again, defense counsel did not object and, therefore, forfeited all but plain error. *Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, at ¶ 3, 21.

{¶ 51} Romalas was convicted of rape in violation of R.C. 2907.02(A)(2), which states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." R.C. 2901.22(A) defines the term "purposely" and states:

> A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.

{¶ 52} In *State v. Wilkins*, 64 Ohio St.2d 382, 386, 415 N.E.2d 303 (1980), the Ohio Supreme Court explained the term "purpose" as defined in R.C. 2901.22(A) is a "bifurcated definition" "intended to encompass both those crimes where the result must be intended, such as causing death in the crime of murder, and those offenses where the act itself is all that must be intended, such as engaging in sexual conduct in the crime of rape."

{¶ 53} We have also recognized that the mens rea of "purposely" applies to "both the conduct and the result" of rape in violation of R.C. 2907.02(A)(2). *State v. Rodriguez*, 8th Dist. Cuyahoga No. 92231, 2009-Ohio-6101, ¶ 29, citing *State v. Ralston*, 9th Dist. Lorain No. 08CA009384, 2008-Ohio-6347, ¶ 17 (noting that in the context of R.C. 2907.02(A)(2) and R.C. 2907.05(A)(1), "[t]he statutory language indicates that 'purposely' applies to both the conduct and the result").

{¶ 54} In *State v. Oliver*, 5th Dist. Licking No. 92-CA-81, 1993 Ohio App. LEXIS 800 (Mar. 29, 1993), the appellant challenged the court's jury instruction defining "purposely" under R.C. 2907.02(A)(2), arguing the bifurcated definition was "confusing and misleading." The trial court's instruction in *Oliver* was as follows:

> A person acts purposely when it is his specific intention to cause a certain result, and in this case at the time in question there must have been present in the mind of the defendant a specific intention to engage in sexual conduct with, in this case, Mary E. Oliver.
>
> Now, a person acts purposely when the gist of the offense is prohibition against conduct of a certain nature regardless of what the offender intends to accomplish, thereby it is his intention to engage in conduct of that nature. Purpose is a decision of the mind to do an act with a conscious objective of producing a specific result. To do an act purposely is to do it intentionally and not accidentally. Purpose and

intent mean the same thing. The purpose with which a person does an act is known only to himself unless he expresses it to others or indicates it by his conduct. Now, the purpose with which a person does an act is determined from the manner in which it is done, the means used. The means in this case is alleged to be that knife, and all other facts and circumstances in evidence. Now, that is the definition of purposely.

*Oliver* at 4-5.

{¶ 55} In finding that the instruction was correct, the Fifth District explained that "purpose," as it pertained to R.C. 2907.02(A)(2), related to both result and conduct. The court explained that "[t]he offender must purposely engage in sexual conduct, but must also purposely compel the other person by force or threat of force, with the result that the person submits because of the force or threat of force." Although the Fifth District acknowledged that the trial court's definition of purpose was "somewhat unclear," the court nevertheless found that the trial court properly instructed the jury "both that appellant must have purposely engaged in the conduct and that he must have purposely compelled Mary to submit." In the instant case, the trial court instructed the jury on the "purposely" mens rea as follows:

> Purpose to engage in sexual conduct is an element of the crime of rape. A person acts purposely when it is his specific intention to cause a certain result. It must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to engage in sexual conduct, to wit, the vaginal penetration, with [M.T.] by purposely compelling her to submit by force or threat of force.
>
> Now, ladies and gentlemen, when the central idea, the essence, or gist of the offense is a prohibition against conduct of a certain nature, a person acts purposely regardless of what the person intended to accomplish, thereby, if it was the person's specific intention to engage in conduct of that nature.

Purpose is a decision of the mind to do an act with a conscious intent, to produce a specific result or engage in specific conduct. To do an act purposely is to do it intentionally and not accidentally. Purpose and intent mean the same thing. The purpose with which a person does an act is known only to that person unless he expresses it to others or indicates it by his conduct.

(Tr. 442-443.)

{¶ 56} The court's instruction that "[p]urpose to engage in sexual conduct is an element of the crime of rape" is an accurate statement of the law. As noted by the courts in *Wilkins*, 64 Ohio St.2d 382, 415 N.E.2d 303, *Rodriguez*, 8th Dist. Cuyahoga No. 92231, 2009-Ohio-6101, ¶ 29, and *Oliver*, the definition of "purpose" as used in R.C. 2907.02(A)(2) requires that the defendant both "purposely compel the other by force or threat of force, with the result that the person submits because of the force or threat of force" and the defendant "must purposely engage in sexual conduct." *Oliver* at 6. Thus, the trial court's instruction that "[i]t must be established in this case that at the time in question there was present in the mind of the defendant a specific intention to engage in sexual conduct, to wit, the vaginal penetration, with [M.T.] by purposely compelling her to submit by force of threat or force" was correct even though it deviated from the model instructions set forth in Ohio Jury Instructions. A trial court is not required to strictly comply with the model instructions, and a trial court's deviation from those instructions "'does not necessarily constitute error by the trial court.'" *State v. Miller*, 2d Dist. Montgomery No. 2857207, 2009-Ohio-4607, quoting *State v. Martens*, 90 Ohio App.3d 338, 343, 629 N.E.2d 462 (3d Dist.1993).

{¶ 57} Therefore, the second assignment of error is overruled.

## C. Continuance

{¶ 58} In the third assignment of error, Romalas argues the trial court erred in denying his request for a continuance to retain new counsel and in requiring him to proceed to trial with retained counsel whom he sought to terminate.

{¶ 59} The decision to grant or deny a motion for a continuance rests in the sound discretion of the trial court. *State v. Unger*, 67 Ohio St.2d 65, 423 N.E.2d 1078 (1981). An abuse of discretion occurs when a court exercises its judgment in an unwarranted way regarding a matter over which it has discretionary authority. *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. Such an abuse "'implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983), quoting *State v. Adams*, 62 Ohio St.2d 151, 157, 404 N.E.2d 144 (1980).

{¶ 60} In *Unger*, the Ohio Supreme Court noted that "[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Unger* at 67. In *Unger*, the court identified certain factors a court should consider in evaluating a motion for a continuance, including

> the length of the delay requested; whether other continuances have been requested and received, the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case.

*Id.* at 67-68.

{¶ 61} In *State v. Nicholson*, 8th Dist. Cuyahoga No. 89245, 2007-Ohio-6653, ¶ 14, the defendant argued the trial court abused its discretion by denying his request to retain new counsel on the day of trial. In affirming the trial court's judgment, we held that the defendant's request was untimely because it was presented on the morning of trial. *Id.* at ¶ 14. We also found that the trial court could "infer the motions were made in bad faith for the purposes of delay" because the defendant "never voiced any dissatisfaction with his retained counsel until the morning of trial." *Id.* at ¶ 15.

{¶ 62} As in *Nicholson*, Romalas requested new counsel on the day of trial even though his retained counsel had represented him for approximately six months and there was no indication prior to the day of trial that he was dissatisfied with his attorney. "When an accused has previous opportunities but waits until the last minute, such as, the morning of trial, to request a substitution of counsel and a continuance, the court may infer the motions were made in bad faith for the purpose of delay." *Nicholson* at ¶ 15.

{¶ 63} Romalas nevertheless asserts the trial court erred in failing to hold a hearing to determine the reason for the delay. Although "a trial court has a duty to investigate reasons behind a defendant's request for a change of counsel," this duty only arises if the allegations are "sufficiently specific." *State v. Philpott*, 8th Dist. Cuyahoga Nos. 109173, 109174, and 109175, 2020-Ohio-5267, ¶ 24-25.

{¶ 64} Romalas did not allege any specific reasons for his desire for new counsel, but he previously had two other lawyers. (Tr.55.) This was a request for a third lawyer

made on the morning of trial. It was, therefore, untimely and the trial court acted within its discretion in denying the request without a hearing.

{¶ 65} The third assignment of error is overruled.

### D. Sufficiency and Manifest Weight

{¶ 66} In the fourth and fifth assignments of error, Romalas argues his rape-and-domestic-violence convictions are not supported by sufficient evidence and that his convictions are against the manifest weight of the evidence. Although the terms "sufficiency" and "weight" of the evidence are "quantitatively and qualitatively different," we address these issues together because they are closely related, while applying the distinct standards of review. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 67} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 68} In contrast to sufficiency, "weight of the evidence involves the inclination of the greater amount of credible evidence." *Thompkins* at 387. While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865

N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *Id.*

{¶ 69} In a manifest-weight-of-the evidence challenge, the reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

## 1. Rape

{¶ 70} As previously stated, Romalas was convicted of rape in violation of R.C. 2907.02(A)(2), which states that "[n]o person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force." Romalas argues there is no evidence, credible or otherwise, that he used force or a threat of force to compel M.T. to engage in sexual conduct.

{¶ 71} R.C. 2901.01(A)(1) defines "force" as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." For purposes of R.C. 2907.02(A)(2), courts have held that the force or threat of force element may be demonstrated either through direct evidence or by inference where the defendant overcame the victim's will by fear. *In re J.W.*, 8th Dist. Cuyahoga No. 109031, 2020-Ohio-4065, ¶ 12, quoting *State v. Schaim*, 65 Ohio St.3d 51, 55, 600 N.E.2d 661 (1992) ("A threat of force can be inferred from the circumstances surrounding sexual conduct[.]"); *State v. Rosa*, 8th Dist. Cuyahoga No. 108051, 2019-

Ohio-4888, ¶ 18, citing *State v. Smelcer*, 89 Ohio App.3d 115, 126, 623 N.E.2d 1219 (8th Dist.1993) ("The element of force can be inferred from the circumstances surrounding the sexual conduct and is established if it is shown that the victim's will was overcome by fear or duress."). Indeed, as previously stated, "[a] victim need not prove physical resistance to the offender" in order to establish a rape offense. R.C. 2907.02(C).

{¶ 72} M.T. testified that Romalas had beaten her numerous times in the past and hit her multiple times shortly before the rape occurred. M.T. also testified that Romalas told her to take her pants off, she refused, and he pulled them down against her will. (Tr. 284.) When asked whether M.T. resisted Romalas, she replied that she did not resist "[b]ecause I was afraid he was going to beat me up more." (Tr. 285.) This court has held that evidence that a defendant removed a victim's "panties" without her consent is sufficient evidence of force or threat of force for purposes of R.C. 2907.02(A)(2). *State v. Whitt*, 8th Dist. Cuyahoga No. 82293, 2003-Ohio-5934, ¶ 22. *See also State v. Wolff*, 9th Dist. Lorain No. 21CA011727, 2022-Ohio-1086, ¶ 14 ("pulling down the victim's pants and/or underwear can constitute sufficient force"). We, therefore, find sufficient evidence to support Romalas's rape conviction.

{¶ 73} Moreover, Romalas admitted that he raped M.T. in the recorded jailhouse phone call that was entered into evidence. His description of the events is consistent with M.T.'s written statement to police on the night of the incident, which was admitted into evidence as state's exhibit No. 3, her narrative statement to the SANE nurse, and her trial testimony, which she gave two and one-half years later. There was no

contradictory evidence presented. We, therefore, find that Romalas's rape conviction is supported by the manifest weight of the evidence.

{¶ 74} Romalas further argues there was no evidence, credible or otherwise, to support his domestic-violence conviction because there was no evidence that M.T. was a "family or household member."

{¶ 75} Romalas was convicted of domestic violence in violation of R.C. 2919.25(A), which states that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(F)(1)(i) defines "family or household member" as "[a] spouse, a person living as a spouse, or a former spouse of the offender[.]" R.C. 2919.25(F)(2) further defines the phrase "person living as a spouse" as "a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise *has cohabited with the offender within five years prior to the date of the alleged commission of the act in question.*" (Emphasis added.)

{¶ 76} M.T. testified that Romalas moved into her apartment after his grandmother passed away in December 2018 or January 2019. (Tr. 282.) There was, therefore, evidence of cohabitation. M.T. further stated that in the months after Romalas moved in, he would stay at her apartment for "a couple days or a couple months" before getting mad and leaving. (Tr. 300.) R.C. 2919.25(F)(2) does not provide a minimum period of time within which two people must cohabitate in order to meet the statutory requirement of cohabitation for purposes of domestic violence.

{¶ 77} In *State v. Williams*, 79 Ohio St.3d 459, 465, 683 N.E.2d 1126 (1997). the Ohio Supreme Court addressed the definition of "cohabitation" as follows:

> [W]e conclude that the essential elements of "cohabitation" are (1) sharing of familial or financial responsibilities and (2) consortium. R.C. 2919.25(E)(2) and related statutes. Possible factors establishing shared familial or financial responsibilities might include provisions for shelter, food, clothing, utilities, and/or commingled assets. Factors that might establish consortium include mutual respect, fidelity, affection, society, cooperation, solace, comfort, aid of each other, friendship, and conjugal relations. These factors are unique to each case and how much weight, if any, to give to each of these factors must be decided on a case-by-case basis by the trier of fact.

{¶ 78} In *State v. Reidel*, 8th Dist. Cuyahoga No. 104929, 2017-Ohio-8865, ¶ 86, this court found that cohabitation of "several months" within the five years prior to the domestic-violence incident was sufficient to meet the cohabitation requirement in R.C. 2919.25(F). And because there was evidence that the defendant and victim lived together, even if only for "several months," the state was not required to prove cohabitation through evidence of financial or familial responsibilities and consortium. *Id.* at ¶ 86, citing *State v. McGlothan*, 138 Ohio St.3d 146, 2014-Ohio-85, 4 N.E.3d 1021, ¶ 15.

{¶ 79} M.T. stated that, at one point, she was pregnant with Romalas's child, but she suffered a miscarriage. (Tr. 300-301.) Conceiving a child together is evidence of consortium. And M.T. testified that Romalas paid "half the rent" for the apartment "one time." (Tr. 309.) Thus, there was competent, credible evidence that Romalas cohabitated with M.T. for at least "a couple months," that they conceived a child together, and that Romalas helped pay the rent. A jury could reasonably infer, based

on this evidence, that M.T. and Romalas lived together as household members for purposes of the domestic violence statute.

{¶ 80} The fourth and fifth assignments of error are overruled.

### E. Ineffective Assistance of Counsel

{¶ 81} In the sixth assignment of error, Romalas argues his Sixth Amendment right to the effective assistance of counsel was violated when his trial counsel failed to request a lesser-included-offense instruction on sexual battery on Count 1. He also claims his trial counsel was ineffective for failing to object to prosecutorial misconduct.

{¶ 82} To establish ineffective assistance of counsel, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that he or she was prejudiced by that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

{¶ 83} There is a presumption in Ohio that the failure to request an instruction on a lesser-included offense constitutes a reasonable "all or nothing" trial strategy. *State v. Lewis*, 8th Dist. Cuyahoga No. 108463, 2020-Ohio-5265, ¶ 51, citing *State v. Jackson*, 6th Dist. Sandusky No. S-15-020, 2016-Ohio-3278, ¶ 20; *State v. Clayton*, 62 Ohio St.2d 45, 402 N.E.2d 1189 (1980).

{¶ 84} By not requesting an instruction on a lesser-included offense, the hope is that the jury will acquit the defendant if the evidence does not support all the elements

of the offense charged. *Id.*, citing *State v. Vogt*, 4th Dist. Washington No. 17CA17, 2018-Ohio-4457, ¶ 119 (It would have been inconsistent to argue for complete acquittal while at the same time arguing for the lesser-included offense.); *State v. Viers*, 7th Dist. Jefferson No. 01JE19, 2003-Ohio-3483, ¶ 47 (Trial courts tend to overrule [ineffective assistance] arguments based upon reviewing court's deference to the all-or-nothing trial strategy.); *State v. Griffie*, 74 Ohio St.3d 332, 333, 658 N.E.2d 764 (1996) ("Failure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel.").

{¶ 85} Romalas argues that because he and M.T. often fought and got back together, it is possible that Romalas misunderstood M.T.'s refusal to consent and that his misunderstanding would negate the purposely mens rea of the rape offense. Based on this possible misunderstanding, he argues that his trial counsel should have requested a jury instruction on the lesser-included offense of sexual battery. However, this argument fails to overcome the presumption that his counsel made a tactical decision to seek an acquittal rather than a conviction on a lesser-included offense. We, therefore, cannot say that counsel's performance was deficient simply because they decided not to request a lesser-included offense instruction.

{¶ 86} Romalas further asserts that his trial counsel was ineffective because they failed to object to multiple instances of prosecutorial misconduct. However, we previously concluded that the prosecutors did not engage in any misconduct. Therefore, any objections to alleged misconduct would have been overruled and the outcome of the trial would have remained unchanged.

**{¶ 87}** The sixth assignment of error is overruled.

### F. Reagan Tokes

**{¶ 88}** In the seventh assignment of error, Romalas argues his indefinite sentence imposed under the Reagan Tokes sentencing scheme is unconstitutional because it violates his constitutional right to a jury trial, the separation-of-powers doctrine, and his due-process rights.

**{¶ 89}** Romalas acknowledges that the question of whether the Reagan Tokes Law is constitutional was decided in this court's en banc opinion in *State v. Delvallie*, 2022-Ohio-470, 185 N.E.3d 536 (8th Dist.). There, this court found "that the Reagan Tokes Law, as defined under R.C. 2901.011, is not unconstitutional," and reaffirmed the principles established in *State v. Gamble*, 2021-Ohio-1810, 173 N.E.3d 132 (8th Dist.); *State v. Simmons*, 2021-Ohio-939, 169 N.E.3d 728 (8th Dist.); and *State v. Wilburn*, 2021-Ohio-578, 168 N.E.3d 873 (8th Dist.). *See Delvallie* at ¶ 17. Because Romalas does not advance any novel argument left unaddressed by the *Delvallie* decision, we find the constitutional challenges presented in this appeal are without merit.

**{¶ 90}** However, Romalas further asserts that his indefinite sentence is contrary to law because the trial court failed to provide the advisement required by R.C. 2929.19(B)(2)(c). Under R.C. 2929.19(B)(2)(c), trial courts are required to provide certain notifications if a nonlife felony indefinite prison term is imposed. The statute provides, in relevant part:

> [I]f the sentencing court determines at the sentencing hearing that a prison term is necessary or required, the court shall do all of the following:

* * *

(c) If the prison term is a non-life felony indefinite prison term, notify the offender of all of the following:

(i) That it is rebuttably presumed that the offender will be released from service of the sentence on the expiration of the minimum prison term imposed as part of the sentence or on the offender's presumptive earned early release date, as defined in section 2967.271 of the Revised Code, whichever is earlier;

(ii) That the department of rehabilitation and correction may rebut the presumption described in division (B)(2)(c)(i) of this section if, at a hearing held under section 2967.271 of the Revised Code, the department makes specified determinations regarding the offender's conduct while confined, the offender's rehabilitation, the offender's threat to society, the offender's restrictive housing, if any, while confined, and the offender's security classification;

(iii) That if, as described in division (B)(2)(c)(ii) of this section, the department at the hearing makes the specified determinations and rebuts the presumption, the department may maintain the offender's incarceration after the expiration of that minimum term or after that presumptive earned early release date for the length of time the department determines to be reasonable, subject to the limitation specified in section 2967.271 of the Revised Code;

(iv) That the department may make the specified determinations and maintain the offender's incarceration under the provisions described in divisions (B)(2)(c)(i) and (ii) of this section more than one time, subject to the limitation specified in section 2967.271 of the Revised Code;

(v) That if the offender has not been released prior to the expiration of the offender's maximum prison term imposed as part of the sentence, the offender must be released upon the expiration of that term.

{¶ 91} The state concedes this error, and our own review confirms that the court did not provide any of the required notifications. Accordingly, the seventh assignment of error is sustained in part and overruled in part.

{¶ 92} Judgment affirmed and remanded to the trial court for the limited purpose of providing Romalas with each of the notifications required by R.C. 2929.19(B)(2)(c).

It is ordered that appellee and appellant share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the common pleas court for correction and execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

MICHELLE J. SHEEHAN, P.J., and
SEAN C. GALLAGHER, J., CONCUR

N.B. Judge Eileen T. Gallagher joined the dissent by Judge Lisa B. Forbes in *Delvallie* and would have found that R.C. 2967.271(C) and (D) of the Reagan Tokes Law are unconstitutional.