[Cite as *State v. Davis*, 2012-Ohio-5179.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 98145**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## LARRY DAVIS

DEFENDANT-APPELLANT

**JUDGMENT:**
**AFFIRMED**

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-554313

**BEFORE:** Stewart, J., Blackmon, A.J., and Keough, J.

**RELEASED AND JOURNALIZED:** November 8, 2012

**ATTORNEY FOR APPELLANT**

R. Brian Moriarty
R. Brian Moriarty, L.L.C.
2000 Standard Building
1370 Ontario Street
Cleveland, OH    44113


**ATTORNEYS FOR APPELLEES**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY:    Milko Cecez
            Kristin Karkutt
Assistant County Prosecutors
The Justice Center
1200 Ontario Street, 9th Floor
Cleveland, OH    44113

MELODY J. STEWART, J.:

{¶1} The court found defendant Larry Davis guilty of rape, sexual battery, and kidnapping. His two assignments of error challenge the evidence supporting the rape count, claiming that the state failed to provide sufficient evidence that he purposely compelled the victim to submit by force or the threat of force and that the victim's testimony was so lacking in credibility that his conviction was against the manifest weight of the evidence.

{¶2} We can quickly dispose of Davis's claim that the state failed to produce sufficient evidence of rape. Viewing the evidence in a light most favorable to the prosecution, *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, at ¶ 78, the victim's testimony was sufficient to establish the essential elements of force or threat of force for a rape conviction under R.C. 2907.02(A)(2). She testified that she visited with Davis and had a few drinks. Davis suggested they go to his room. Once there, he removed her clothing, and had sexual intercourse with her. As the sexual intercourse occurred, the victim testified that she told Davis to stop and tried to push him away, but he pushed her back down. A rational trier of fact could have found this sufficient evidence that Davis engaged in sexual intercourse by force or threat of force. *See State v. Nicodemus*, 10th Dist. No. 96APA10-1359, 1997 WL 254095 (May 15, 1997) (finding use of force to compel sexual activity where appellant continued to engage in

sexual conduct despite being pushed away repeatedly by the victim); *State v. Alkire*, 12th Dist. No. CA2008-09-023, 2009-Ohio-2813 (affirming conviction for rape by force where victim repeatedly pushed appellant away, and told appellant "no" and "stop" on several occasions during the sexual conduct).

{¶3} The more difficult question on appeal is whether the evidence was so lacking in credibility that the court's judgment of conviction is against the manifest weight of the evidence.

{¶4} The manifest weight of the evidence standard of review requires us to review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Otten*, 33 Ohio App.3d 339, 340, 515 N.E.2d 1009 (9th Dist.1986). The use of the word "manifest" means that the trier of fact's decision must be plainly or obviously contrary to all of the evidence. This is a difficult burden for an appellant to overcome because the resolution of factual issues resides with the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶5} The victim opened her testimony by characterizing herself as "emotionally disturbed." She said that she was on disability for her emotional issues and took

medication for depression and anxiety. The medicine kept her from "being depressed" and "doing a lot of crime."

{¶6} She testified that on the night of the rape she had consumed a 40 ounce can of beer and then went in search of a cigarette. Knowing that Davis smoked the same brand of cigarette that she smoked, she went over to the house that Davis shared with his brother-in-law and the brother-in-law's wife. She said that she did not plan on going inside Davis's house, but when Davis said that he would give her a cigarette, she decided to stay a while. The victim asked Davis for a beer, but he had none and instead offered her rum. Although she claimed to not drink "liquor," the victim told Davis to "fix me a shot." Davis poured her a drink and they went into the dining room, where they listened to music on the radio. The victim accepted a second drink. Davis then asked her if she wanted to see his "room." She agreed, saying she thought that his "room" was not his bedroom, but another living room. Davis took her to his bedroom, a space the victim said was so small that "you can't help but sit on his bed." She said that Davis then removed his clothes and that as he did so, "I was just looking, I couldn't even get up and stuff." When asked why she did not leave the room, she replied, "I don't know, it was like, something — know what, I hate to say, I think, it was like, something about that drink. I don't know." She said she felt dizzy and drowsy after her second drink, in effect paralyzed, and "could not get up, and even try, to go out the door or nothing[.]" She said Davis then began removing her clothes and that "I couldn't even do nothing but let him have his way." She told him "no" and "stop," but he did not stop. When she

was entirely naked, he laid her on the bed and had intercourse with her, despite her squeezing her legs together to try to prevent it. When she tried to get off the bed, she said he pushed her back down.

{¶7} The victim said she passed out as Davis had intercourse with her and woke up after 10 or 15 minutes to find Davis dressing her. She testified that she could not recall how she left Davis's bedroom, but somehow found herself back at her house. She estimated that she spent four to five hours with Davis.

{¶8} The victim called her niece and told her that Davis had raped her. The niece expressed disbelief at the accusation because the victim had known Davis for so long that she considered him family (the victim called Davis "cousin.") The niece said that if the victim's allegations were true, the victim should go to the hospital and report the rape. The victim refused, so the niece ended the conversation. The following day, the victim again spoke with her niece, who asked the victim if she remembered calling and accusing Davis of raping her. The victim told the niece that Davis "didn't do nothing to me." The victim said she recanted the accusation because she had no proof that the rape occurred.

{¶9} It turns out that Davis and the victim were not alone in the house at the time of the rape — Davis's brother-in-law was present. The brother-in-law testified that he had been drinking that evening (a six-pack of beer in 90 minutes) and gone to bed between 7 and 8 p.m. He woke up during the night to use the bathroom. When he went back to bed, he thought he heard what sounded like someone saying "no, stop." He said

that he did not know where the voice came from, thinking that it might have come from the television in his bedroom. He conceded that the voice did not concern him and he fell back asleep. The brother-in-law awoke two to three hours later, again to use the bathroom. This time he heard multiple voices on the first floor of the house. He awoke his wife and said that one of the voices sounded like the victim. He fell back asleep, only to be awakened by someone with a mask and gun banging on his bedroom door. The masked man asked for Davis. The brother-in-law said that he did not know Davis's whereabouts. The masked man told the brother-in-law that when he next saw Davis, to tell him that "he was a dead MF." The intruder then fled. The brother-in-law could not say precisely when this incident occurred, but estimated it to be around 1 or 2 a.m. When asked if he called the police to report the intruder, the brother-in-law replied that he did not, saying that the threat was not directed at him, so he was unconcerned about it.

{¶10} The brother-in-law testified that the following morning, he dressed and went to the victim's house. He found her sitting calmly on the couch, smoking a cigarette. Curious as to why the gunman entered his house, he knew that the victim had been present in the house earlier that evening and thought she might shed some light on what happened. Before the victim could answer, her boyfriend walked in the room. The victim's demeanor completely changed — she began crying and said that Davis had raped her. The brother-in-law returned to the house. When Davis returned to the house, the brother-in-law told him about the masked intruder and suggested that it might be wise for

Davis to leave. The brother-in-law did not mention the victim's rape allegations. Davis took some of his belongings and left the house.

{¶11} Davis testified that he and the victim engaged in consensual sexual intercourse. Apart from the victim's claim that she had been forced to have sex, Davis's version of events generally matched those described by the victim. He said that when they finished having sexual intercourse, they dressed and he walked her home.

{¶12} When rendering its verdict, the court found the "key element in this case has to do with the corroborating evidence of [the brother-in-law]." The court wondered why the brother-in-law did not investigate the sounds of resistance he heard from the victim, but it nonetheless found that testimony consistent with the victim's version of events.

{¶13} The court's reliance on the brother-in-law's corroborating testimony is somewhat troublesome. The brother-in-law admitted to drinking heavily that evening (he said that he woke up the next morning with a "hangover"), so his recall of events occurring in the middle of the night could be suspect. In fact, the brother-in-law admitted as much, saying that he could not be sure whether the voice he heard saying "no, stop," was the victim or a voice on the television. What is clear is that he conceded that the words he heard did not trouble him enough to investigate whether they were uttered in distress. He did not give them a second thought and returned to bed.

{¶14} In addition to not being certain he heard the victim during the rape, the timing of events as detailed by the brother-in-law did not correspond to those same events as detailed by the victim. For example, the victim testified that she passed out for 10-15

minutes while being raped and awoke to find Davis dressing her. She said that once Davis finished dressing her, "I got out of his room, and I left out of there." However, the brother-in-law testified that at least two hours elapsed from the time he heard the voice saying "no, stop" to the time he heard the victim's voice again. Although the victim did not state an exact amount of time that elapsed from the time of the rape to when she left the house, her testimony could not be construed to indicate that she was still in the house two hours after the rape. Someone had the wrong version of events.

{¶15} The brother-in-law's testimony about when he spoke with the victim following the rape was also inconsistent from that of other witnesses. He insisted that he spoke with the victim the day after she had been with Davis at the house. But both the victim and her niece firmly recalled that the victim's conversation with the brother-in-law did not occur until four or five days after the rape.

{¶16} Finally, the brother-in-law's testimony concerning the masked intruder who threatened Davis is bizarre. The timing of the intruder's presence in the house might have been understood as being connected to the rape given the nature of his threat to Davis. In fact, the victim testified that one of the reasons she did not immediately go to the police was because she hoped to avenge her rape by hiring a homosexual man to rape Davis. But there could not have been any connection between the intruder and the rape. The victim testified that the only person she talked to the night of the rape was her niece. The niece testified that she did not believe the victim's accusations, so it would be implausible to believe that she arranged for an intruder to enter the brother-in-law's house

to threaten or harm Davis. The intruder's motive for threatening Davis remains so obscure that the brother-in-law's testimony about it casts serious doubt on his ability to recall events.

{¶17} In the end, the court had reasons to doubt elements of the state's case: the victim was admittedly emotionally troubled, she first approached Davis and invited herself into his house, she was apparently under the influence of alcohol at the time of the rape, and she recanted her initial accusation. When the victim reaccused Davis, she did so only after speaking to the brother-in-law, and only after her boyfriend entered the room, creating the possibility that her boyfriend's presence motivated her to fabricate the rape lest she be accused by the boyfriend of cheating with Davis. Finally, the brother-in-law conceded that he could not be sure if he actually heard a female voice saying, "no, stop," he was admittedly drinking that evening so his recall of events was open to question, and he gave testimony that was fanciful and otherwise contradicted by other witnesses.

{¶18} Reviewing courts give great deference to the trier of fact. We do so because:

> The fact-finder * * * occupies a superior position in determining credibility. The fact-finder can hear and see as well as observe the body language, evaluate voice inflections, observe hand gestures, perceive the interplay between the witness and the examiner, and watch the witness's reaction to exhibits and the like. Determining credibility from a sterile transcript is a Herculean endeavor. A reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder.

*State v. Thompson*, 127 Ohio App.3d 511, 529, 713 N.E.2d 456 (8th Dist.1998).

**{¶19}** This is a case on which reasonable minds could view the evidence and differ on whether Davis committed rape. A difference of opinion on the strength of the evidence, however, is not enough to warrant a reversal. To reverse the court's verdict in this appeal, we must find that its verdict is *manifestly* against the weight of the evidence. The deference we show the findings by the trier of fact is such that, in context, the word "manifest" means that the court's verdict must be clearly erroneous when considered against all the evidence. The court heard the evidence and viewed the witnesses. It found the brother-in-law's testimony about hearing a voice say "no, stop," to be compelling and found nothing to support a finding that the victim engaged in consensual sexual intercourse. From this conclusion, the court must have necessarily decided that later inconsistencies in the brother-in-law's testimony were inconsequential and that the victim's recantation and reaccusation of Davis were the product of a confused emotional state. Some might quarrel with these conclusions, but they were not so manifestly wrong that we can conclude that the trial court lost its way by finding Davis guilty.

**{¶20}** Judgment affirmed.

It is ordered that appellee recover of appellant its costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MELODY J. STEWART, JUDGE

PATRICIA ANN BLACKMON, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR