**[Cite as *In re P.V.*, 2024-Ohio-2324.]**

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## TRUMBULL COUNTY

IN THE MATTER OF:

P.V., DELINQUENT CHILD

CASE NO. 2023-T-0011

Criminal Appeal from the
Court of Common Pleas,
Juvenile Division

Trial Court No. 2021 JD 00248

# O P I N I O N

Decided: June 17, 2024
Judgment: Affirmed

*Dennis Watkins*, Trumbull County Prosecutor, and *Ryan J. Sanders*, Assistant Prosecutor, Administration Building, Fourth Floor, 160 High Street, N.W., Warren, OH 44481 (For Appellee, State of Ohio).

*Michael A. Scala*, 244 Seneca Avenue, N.E., P.O. Box 4306, Warren, OH 44482 (For Appellant, P.V.).

MARY JANE TRAPP, J.

{¶1}　Appellant, P.V., appeals the judgment of the Trumbull County Court of Common Pleas, Juvenile Division, that found him delinquent on three counts of rape and one count of gross sexual imposition ("GSI"). The court sentenced him to the Department of Youth Services ("DYS") for 12 months or up to the age of 21, with the requirement that he complete the DYS sex offender program prior to his release.

{¶2}　P.V. raises four assignments of error for our review, contending (1) the magistrate erred by finding there was sufficient evidence of "force or threat of force;" (2)

the magistrate erred by finding the three counts of rape and one count of GSI were proven beyond a reasonable doubt; (3) and (4) the juvenile court procedures of allowing a magistrate to hold a hearing and issue findings of fact and conclusions of law that the trial court adopts and allowing juvenile charges to be brought by complaint without a preliminary hearing or a grand jury indictment as required in adult criminal court are unconstitutional and amount to unequal protection under the law.

{¶3} After a careful review of the record and pertinent law, we find P.V.'s assignments of error to be without merit.

{¶4} A review of the state's evidence reveals there was sufficient evidence of "force" and/or "threat of force," since the victim, M.S., age 15 at the time of the offenses, repeatedly told P.V. "no" and to "stop." P.V., however, ignored her protests, removed her clothing, and continued to engage in sexual activity. Against her will, he engaged in cunnilingus, while simultaneously inserting his fingers and, later, a nicotine vape pen into her vagina. He then proceeded to have vaginal sex with the victim.

{¶5} P.V.'s remaining arguments under his first two assignments of error involve the credibility of the witnesses and his competing version of events, i.e., that the acts were consensual. These arguments, however, challenge the manifest weight of the evidence and not whether sufficient evidence was introduced on each element of the charged offenses. Viewing the evidence in a light most favorable to the prosecution, there is sufficient evidence from which a trier of fact could find, beyond a reasonable doubt, P.V. delinquent on three counts of rape and one count of GSI.

{¶6} Lastly, we disregard P.V.'s third and fourth assignments of error challenging the juvenile court procedure of allowing a magistrate to conduct a delinquency hearing

2

and the lack of a municipal preliminary hearing or grand jury indictment because he fails to support his general averments with any legal authorities or citations to the record. Thus, he failed to meet his burden to affirmatively demonstrate error on appeal.

{¶7} The judgment of the Trumbull County Court of Common Pleas, Juvenile Division, is affirmed.

## Substantive and Procedural History

{¶8} In November 2021, a complaint was filed in the Trumbull County Court of Common Pleas, Juvenile Division, charging P.V., age 14 at the time of the offenses, with one count of GSI, a fourth-degree felony if committed by an adult, in violation of R.C. 2907.05(A)(1) and (C), and three counts of rape, first-degree felonies if committed by an adult, in violation of R.C. 2907.02(A)(2) and (B).

{¶9} In August 2022, a one-day trial was held before a magistrate. The state presented the testimony of M.S., the victim; Detective Anthony Roberts ("Det. Roberts") from the Niles Police Department; and Trooper Jack Reno ("Trooper Reno") from the Ohio State Highway Patrol, who performed P.V.'s polygraph test. The state entered into evidence an "agreed entry of stipulation of polygraph" in which P.V. agreed to submit to a polygraph test administered by Trooper Reno, who was also permitted to testify at trial provided the results were not "inconclusive"; a video recording of the test; Trooper Reno's investigation report of the test; and an Ohio Bureau of Criminal Investigation ("BCI") DNA report matching P.V.'s DNA to ejaculate found on M.S.'s bra.

{¶10} The defense presented the testimony of D.V., P.V.'s grandmother; and T.R., P.V.'s aunt; and evidence of a text conversation between P.V. and M.S.

3

Case No. 2023-T-0011

{¶11} The state's evidence revealed that P.V. and M.S. began dating in September 2021. M.S. described P.V. as "controlling." He would log into her accounts, and she felt isolated from her friends. He regularly told her he wanted to have sex. He told her that he was not a virgin and that he had been previously accused of rape.

{¶12} On September 18, 2021, M.S. told her mom she would be staying the night at her friend's house but met P.V. at a church in Niles instead. After they walked around Niles, they went to P.V.'s grandmother's apartment, where they decided to spend the night together in P.V.'s aunt's minivan in the parking lot of the apartment building.

{¶13} In the early evening, they got into the minivan. They were in the backseat, and P.V. asked M.S. if he could give her "hickies" "on her breasts." M.S. took off her shirt. At first, she "was okay with it," and then she "just wanted him to stop." She "asked if he could please stop." He told her, "it'll be okay," and he "kept going." She asked him several more times to stop, but he continued, removing her pants and underwear while he did so. She continued to ask him to stop, but he just "kept saying it would be okay." She "was scared." She was a virgin and inexperienced.

{¶14} P.V., who had also taken off his shirt, proceeded to move down M.S.'s body with his mouth to her vagina. She asked him to stop, but he did not respond and proceeded to engage in cunnilingus. She did not want or ask him for oral sex, and she asked him to stop "quite a few times." During the oral sex, P.V. inserted his fingers into her vagina. M.S. told him to stop; however, P.V. continued, telling her "it [will] be okay." M.S. was "scared still."

{¶15} P.V. stopped the oral sex and went inside the apartment to go to the bathroom. M.S. did not run away because she "was afraid," she "didn't know when he

4

was coming back," her phone was dead, and it was late at night. When P.V. came back, he asked her to move into the middle backseat. After he insisted several times, she complied. He had her lie down, and he placed her legs up. He took his electronic cigarette "vape" pen and, without saying anything, inserted it into her vagina. M.S. asked him to stop, she told him "it hurts, can you please take it out," and she started to cry. She continued to be in fear.

{¶16} P.V. climbed on top of her and told her that he was going to "take his penis" and "rub it" on her vagina. M.S. testified she was not ready, she did not want to have sex, and she continued to be in fear. P.V. inserted his penis into her vagina, and "it stung." After having sexual intercourse for several minutes, he masturbated on top of her, ejaculating on her stomach and bra. M.S. lied there crying, and P.V. told her to put on her clothes.

{¶17} P.V. took her into the apartment so she could go to the bathroom. He followed her into the bathroom even though she asked him not to. He told her "he was proud of taking [her] virginity." He did not show any remorse, and he told her it was her fault and that she "made him do it."

{¶18} They fell asleep in the minivan. In the morning, they went back into the apartment. M.S. was changing when P.V., laughing, hit her in her vagina with a closed fist. She walked home.

{¶19} They continued to see each other for about a week after the incident because M.S. "was afraid to break up with him." They communicated through text messages and at school. She tried to avoid him as much as possible. She confided in the school's guidance counselor that she was afraid of P.V., which prompted the

5

counselor to switch M.S.'s classes so she would not have to interact with him. M.S. also confided in her friend, who helped her end the relationship with P.V.

{¶20} Approximately two weeks after the incident, M.S. attempted suicide by ingesting pills. She was taken to Akron Children's Hospital. She told the nurses, a social worker, and her mother about the night with P.V. She also admitted to other self-harm behavior following the incident, such as cutting her wrists and thighs with a razor blade. The incident was reported to the police, M.S. was interviewed by the Child Advocacy Center in Akron Children's Hospital, and a physical examination was performed.

{¶21} During the trial, M.S. denied smoking marijuana on the night of the incident. On cross-examination, she recalled an incident that took place in the first few days of their relationship, in which P.V. headbutted her in the vagina at the park. She further testified that her friends did not like P.V.

{¶22} When Det. Roberts interviewed P.V., P.V. denied touching M.S. and then told the detective that M.S. raped him. Det. Roberts also collected M.S.'s bra as evidence. A DNA test revealed it contained P.V.'s semen.

{¶23} Trooper Reno administered P.V.'s polygraph test, which consisted of a pre-test interview, the test, and a post-test interview. During the pre-test interview, P.V. admitted to touching M.S.'s breasts, performing cunnilingus, inserting his fingers into M.S.'s vagina while performing cunnilingus, inserting a vape pen into M.S.'s vagina, and engaging in sexual intercourse with M.S. He stated he committed these sexual acts with M.S.'s consent, and he denied that M.S. ever told him to stop.

6

Case No. 2023-T-0011

{¶24} The polygraph test was comprised of three questions: "Did [M.S.] tell you no or stop while having sex with her?," "During sex with [M.S.], did she ever tell you no or to stop?", and "Did [M.S.] ever tell you to stop or no during any sexual activity?"

{¶25} P.V. answered "no" to all three questions. The results indicated deception or lying. During the post-test interview, Trooper Reno informed P.V. of the test results. P.V. informed the trooper, for the first time, that he had been high during the incident and that he did not remember anything. He further told the trooper that he and M.S. smoked ten grams of marijuana that night. He eventually admitted that M.S. asked him to stop and that he "forgot" she said no.

{¶26} At the end of the state's case, defense counsel made a Crim.R. 29 motion, challenging the sufficiency of the evidence and arguing the evidence reflected a consensual sexual encounter. The trial court overruled the motion, finding the state introduced evidence that satisfied all the elements of the offenses.

### The Magistrate's Decision

{¶27} Following the hearing, the magistrate found in its decision, which the trial court adopted, P.V. delinquent on all four counts and ordered P.V. to be committed to the legal custody of DYS for 12 months or up until he is 21 years of age. In addition, the court ordered P.V. to complete the DYS sex offender program prior to his release.

{¶28} Upon defense counsel's motion, the magistrate issued, and the trial court adopted, 66 findings of fact and conclusions of law. In sum, the magistrate found P.V.'s statements to Det. Roberts and Trooper Reno were inconsistent and contradictory and therefore unreliable. The magistrate further found M.S.'s testimony to be consistent and reliable. The magistrate found P.V.'s acts of sexual activity, sexual contact, and sexual

7

conduct were done without the consent and against the express wishes of the victim. As to the count of GSI, the magistrate found that "during the sexual contact (of P.V. touching M.S.'s breasts), the victim began to request that [P.V.] stop engaging in sexual contact; despite the requests of the victim, [P.V.] continued to engage in sexual activity; during the sexual activity the pants and underwear of the victim were removed, [w]hile the pants and underwear of the victim were being removed, the victim repeatedly asked [P.V.] to stop engaging in sexual activity."

{¶29} The magistrate concluded, "the actions of P.V. in continuing the acts without M.S.'s consent and expressed wishes constituted force or threat of force as defined in R.C. 2907.02; the actions of P.V. in performing cunnilingus upon the victim, inserting an instrument, apparatus or other object and the act of vaginal intercourse with the use of force or threat of force constituted three acts of rape, in violation of R.C. 2907.02(C); and, the actions of P.V. in kissing the breasts of M.S. with the use of force or threat of force constituted GSI, in violation of R.C. 2907.05(A)(1)."

{¶30} P.V. filed objections, contending there was no evidence of "force" or "threat of force," the magistrate failed to find "reasonable doubt" after hearing all the evidence, and the juvenile process is fundamentally unfair since all cases are directed by one prosecutor who files a complaint instead of a municipal preliminary hearing or a grand jury indictment.

{¶31} After an independent review, the trial court overruled P.V.'s objections and found P.V. to be delinquent on three counts of rape and one count of GSI.

{¶32} P.V. raises four assignments of error for our review:

8

{¶33} "[1.] The Trial Magistrate found, to the detriment of Appellant, that the necessary element to Appellant's conviction, "force or threat of force", was established despite the lack of evidence on this element.

{¶34} "[2.] The Magistrate found, to the detriment of Appellant, that all elements of these four counts of rape, rape, rape, and gross sexual imposition were proved beyond a reasonable doubt.

{¶35} "[3.] The Trial Magistrate heard this case and referred it to the Trial Judge, who approved his findings and decision of guilty to all four counts.

{¶36} "[4.] The State of Ohio erred by allowing a case of this magnitude being prepared and prosecuted by a single prosecutor, without the municipal preliminary hearing or a grand jury indictment as required in adult criminal court."

### Sufficiency of the Evidence

{¶37} In his first assignment of error, P.V. contends there was insufficient evidence of "force" or "threat of force" on the three counts of rape and the count of GSI. More specifically, P.V. contends there was "no physical evidence of any force." In his second assignment of error, P.V. contends the magistrate erred by finding the elements of all four counts "were proved beyond a reasonable doubt."

{¶38} A juvenile court may adjudicate a juvenile as a delinquent child when the evidence demonstrates beyond a reasonable doubt that the child committed an act that would constitute a crime if committed by an adult. R.C. 2151.35(A); Juv.R. 29(E)(4); *In re R.D.H.*, 11th Dist. Lake No. 2015-L-132, 2016-Ohio-5570, ¶ 12.

{¶39} A Juv.R. 29(A) motion for acquittal tests the sufficiency of the evidence and requires a trial court to issue a judgment of acquittal when the state fails to establish

9

sufficient evidence to support a conviction. *Id.* at ¶ 15. Appellate courts review the denial of a motion for acquittal under the same standard for arguments asserting insufficient evidence. *Id.*

{¶40} ""[S]ufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law."" *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy." *Id.*

{¶41} "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶42} When conducting a sufficiency of the evidence analysis, this court is to look at the actual evidence admitted at trial, both admissible and inadmissible. *State v. Kessler Scott*, 11th Dist. Lake No. 2022-L-018, 2022-Ohio-4054, ¶ 26. Further, a claim of insufficient evidence invokes a question of due process, the resolution of which does not allow for a weighing of the evidence. *Id.*

{¶43} P.V. was found delinquent on three counts of rape in violation of R.C. 2907.02(A)(2), which provides:

10

{¶44} "No person shall engage in sexual conduct with another when the offender purposely compels the other person to submit by force or threat of force."

{¶45} Pursuant to R.C. 2907.02(C), "A victim need not prove physical resistance to the offender * * *."

{¶46} P.V. was also found delinquent on one count of GSI in violation of R.C. 2907.05(A)(1), which provides:

{¶47} "No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * [t]he offender purposely compels the other person, or one of the other persons, to submit by force or threat of force."

{¶48} Pursuant to R.C. 2907.05(D), "A victim need not prove physical resistance to the offender * * *."

{¶49} We note that the force element needed to prove the offense of GSI is the same as it is for rape. *State v. Riggs*, 10th Dist. Franklin Nos. 04AP-1279 and 04AP-1280, 2005-Ohio-5244, ¶ 20.

{¶50} "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). The Supreme Court of Ohio has held only minimal force or threat of force is required. *State v. Dye*, 82 Ohio St.3d 323, 328, 695 N.E.2d 763 (1998) ("In fact, R.C. 2907.02(B) requires only that minimal force or threat of force be used in the commission of the rape"). Further, when evaluating force in the context of rape, relevant considerations may involve the age, size, strength, and relationship of the parties. *State v. Eskridge*, 38 Ohio St.3d 56, 58,

11

Case No. 2023-T-0011

526 N.E.2d 304 (1988). Moreover, "[a] threat of force can be inferred from the circumstances surrounding sexual conduct * * * ." *State v. Schaim*, 65 Ohio St.3d 51, 600 N.E.2d 661 (1992), paragraph one of the syllabus.

{¶51} In addition, consent – or withdrawn consent – may be relevant. "Evidence of consent (or lack thereof) is important to the inquiry. It is not a static concept, though. Rape can be established when the two participants start the encounter on a consensual basis, 'but the consent is revoked by words, actions or conduct that clearly communicates non-consent, the defendant fails to respect the change in consent, and purposely proceeds to engage in sexual conduct through force or threat of force evidenced by violence, physical restraint, or some type of coercive or threatening conduct that creates a belief or fear that physical force will be used if the victim does not consent.'" *State v. Freeman*, 2d Dist. Greene No. 2020-CA-33, 2021-Ohio-734, ¶ 42, quoting *State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 32 (2d Dist.).

{¶52} For instance, in *Freeman*, the Second District rejected the appellant's argument that a sexual encounter was consensual and determined the appellant purposely compelled the victim to submit by force or threat of force where the state's evidence established the victim did not consent to the sexual encounter. *Id.* at ¶ 43. The victim had texted the appellant previously that they "would not be sleeping with each other." *Id.* When the appellant straddled her and attempted to remove her shorts, she told him to get off, and when he pushed her back and removed her clothes, she told him to stop. *Id.* When he vaginally penetrated her, she again told him to stop and tried to push him away. *Id. See also In re S.W.E.*, 2d Dist. Greene No. 2020-CA-27, 2021-Ohio-

12

80, ¶ 41 (even if the encounter started out as consensual, it is clear from the victim's testimony that she revoked any consent that might have been communicated).

{¶53} In this case, a review of the state's evidence reveals M.S. testified she felt P.V. was controlling, he read her messages, he isolated her from her friends, and he would "get mad if she did certain things." M.S. was aware that P.V. had been previously accused of committing rape, and he had hit her in the genitals in the past. The incident occurred late at night, M.S.'s phone was dead, she had lied to her mother about where she was spending the night, and they were in a closed minivan in the parking lot of P.V.'s grandmother's apartment complex. While this evidence does not necessarily go to a sufficiency analysis of rape and GSI, under the circumstances of this case, it is demonstrative of the victim's fear in a case that some may misguidedly and dismissively label as "he said/she said."

{¶54} Regarding the specific instances of rape, M.S. testified P.V. was on top of her, she was scared still, P.V. ignored her repeated requests to stop, P.V.'s actions, i.e., his insertion of his fingers, vape pen, and penis, were hurting her, and she was crying. P.V. admitted in the taped post-polygraph test interview that M.S. said "no" and "to stop." Afterward, P.V. told M.S. it was her fault the sexual contact and conduct occurred.

{¶55} We have found sufficient evidence of force or threat of force under similar circumstances. For example, in *State v. Hodges*, 11th Dist. Ashtabula No. 2020-A-0026, 2020-Ohio-4693, we found sufficient force or threat of force where the appellant grabbed the victim, put her on the couch, removed her shorts, and placed her on top of him. *Id.* at ¶ 50. The victim further testified she asked him to stop, told him it hurt, and was crying. *Id.* In that case, we also reviewed other similar cases where this court and other courts

13

Case No. 2023-T-0011

found sufficient evidence of force or threat of force. *Id.* at ¶ 51-56, citing *State v. Williams*, 11th Dist. Portage No. 2005-P-0009, 2006-Ohio-1169, ¶ 40 (sufficient evidence of force where the defendant's conduct included "putting the victim on a hard floor, taking off her shorts, and engaging in vaginal intercourse which caused her pain"); *State v. Shannon*, 11th Dist. Lake Nos. 2002-L-007 and 2002-L-008, 2004-Ohio-1669, ¶ 95 (sufficient evidence of force where the appellant laid on top of the victim and proceeded to have intercourse with her after she conveyed her lack of consent); *State v. Rucker*, 2020-Ohio-2715, 154 N.E.3d 350, ¶ 11 (8th Dist.) (sufficient evidence of force that included sexual conduct despite the victim's repeated statements telling the defendant to stop and/or that she did not want to engage in any sexual activity); *State v. Davis*, 8th Dist. Cuyahoga No. 98145, 2012-Ohio-5179, ¶ 2 (sufficient evidence of force where the defendant removed the victim's clothing and engaged in sexual intercourse while the victim told the defendant to stop); *State v. Whitt*, 8th Dist. Cuyahoga No. 82293, 2003-Ohio-5934, ¶ 22 (sufficient evidence of force where defendant removed victim's dress and underwear without her consent).

{¶56} Regarding the count of GSI, the record makes this a closer call. The record shows that M.S. revoked her consent during the sexual activity of P.V. touching her breasts. She repeatedly told P.V. to stop, yet he continued to give her hickies on her breasts, and, while he did so, manipulated and removed her clothing. M.S. testified that she "had first asked him to stop when he was giving me the hickies. I had asked him to stop doing it during that, and I had asked him to stop when he had taken my pants off." Numerous Ohio courts have held that the removal of clothing can constitute sufficient evidence of "force or threat of force." *See State v. Wolff*, 9th Dist. Lorain No.

14

21CA011727, 2022-Ohio-1086, ¶ 14 (courts have found pulling down the victim's pants and/or underwear can constitute sufficient evidence); *State v. Jackson*, 2023-Ohio-455, 208 N.E.3d 1010, ¶ 72 (8th Dist.) (evidence that a defendant removed a victim's "panties" without her consent is sufficient evidence of force or threat of force).

{¶57} Simply because the encounter began as consensual does not equate to a finding of insufficient evidence of force or threat of force. Courts have found sufficient evidence to uphold convictions for GSI under these and lesser circumstances. *See, e.g., State v. Ramsey*, 2023-Ohio-807, 210 N.E.3d 1088, ¶ 55 (8th Dist.) (sufficient evidence of GSI where victim testified the appellant touched her leg and vagina without consent, she was scared, and she did not know if she could leave); *State v. Howard*, 4th Lawrence Dist. No. 21CA11, 2022-Ohio-2347, ¶ 14-16 (although victim's testimony suggests the appellant did not use a great amount of force, "any" recognizes the various different degrees and manners of force); *State v. Glover*, 8th Dist. Cuyahoga No. 83341, 2004-Ohio-4482, ¶ 22-23 (judge's personal belief of the evidence was irrelevant; victim testified the defendant had sexual contact with her and she resisted); *State v. Burke*, 2020-Ohio-4781, 159 N.E.3d 1272, ¶ 22 (3d Dist.) (sufficient evidence of force found where there was testimony by the victim and her friends that the defendant pulled on the victim's shorts with enough force to show her underwear).

{¶58} Despite the minimum threshold of evidence required to establish sufficient sexual activity for GSI, it bears repeating that Ohio law requires "some amount of force must be proven beyond that force inherent in the crime itself." *Dye*, 82 Ohio St.3d at 327, 695 N.E.2d 763. *See State v. Torres*, 2023-Ohio-1406, 213 N.E.3d 287 (4th Dist.) (no evidence of force beyond the crime itself where there was no evidence that the appellant

15

manipulated or moved the victim's clothing to touch her breast while she was sleeping).

Here, the state minimally developed enough evidence of GSI to satisfy a sufficiency analysis. Such close calls are easily remedied with a few more proper questions.

{¶59} P.V.'s further arguments involve the credibility of M.S. as a witness, the magistrate's findings that M.S. was a credible witness and that P.V. was not a credible witness, and his competing version of events, i.e., the sexual contact and conduct were consensual. These arguments, however, are not considered on a sufficiency-of-the-evidence claim. Rather, they go to the manifest weight of the evidence. As this court explained in *In re R.D.H.*, 2016-Ohio-5570, "appellate courts do not consider a witness' credibility when reviewing a sufficiency-of-the-evidence claim. * * * Instead, we determine whether the testimony and other evidence presented satisfy every element of the offense." *Id.* at ¶ 13.

{¶60} Even in the context of a manifest-weight-of-the-evidence claim, it is well-settled that when assessing the credibility of witnesses, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). Furthermore, if the evidence is susceptible to more than one interpretation, a reviewing court must interpret it in a manner consistent with the verdict. *Warren v. Simpson*, 11th Dist. Trumbull No. 98-T-0183, 2000 WL 286594, *3 (Mar. 17, 2000).

{¶61} Viewing the evidence in a light most favorable to the prosecution, there is sufficient evidence from which a trier of fact could find, beyond a reasonable doubt, P.V. delinquent on three counts of rape and one count of GSI.

16

Case No. 2023-T-0011

**{¶62}** P.V.'s first and second assignments of error are without merit.

## Due Process in Juvenile Court Proceedings

**{¶63}** In his third and fourth arguments, P.V. attacks the juvenile court process. More specifically, he makes a general averment that juveniles are not afforded equal protection in the state of Ohio because magistrates hold delinquency hearings and issue findings of fact and conclusions of law that the trial court adopts and because there is no preliminary hearing or grand jury process in juvenile court. He concedes the proper procedure was followed in this case.

**{¶64}** At the outset, we note that P.V. combined these arguments in his brief and failed to cite to any legal authorities pursuant to App.R. 16(A)(7). This rule provides: "The appellant shall include in its brief * * * [a]n argument containing the contentions * * * with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies."

**{¶65}** "An appellant 'bears the burden of affirmatively demonstrating error on appeal.'" *Tally v. Patrick*, 11th Dist. Trumbull No. 2008-T-0072, 2009-Ohio-1831, ¶ 22, quoting *S. Russell v. Upchurch*, 11th Dist. Geauga Nos. 2001-G-2395 and 2001-G-2396, 2003-Ohio-2099, ¶ 10. "'It is not the obligation of an appellate court to search for authority to support an appellant's argument as to an alleged error. *See Kremer v. Cox* (1996), 114 Ohio App.3d 41, 60 * * *. Furthermore, if an argument exists that can support appellant's assignments of error, "it is not this court's duty to root it out." *Harris v. Nome*, 9th Dist. No. 21071, 2002-Ohio-6994.'" *Tally* at ¶ 22. "Accordingly, we may disregard an assignment of error that fails to comply with App.R. 16(A)(7)." *Id.*

17

Case No. 2023-T-0011

**{¶66}** P.V.'s third and fourth assignments of error are without merit.

**{¶67}** The judgment of the Trumbull County Court of Common Pleas, Juvenile Division, is affirmed.

ROBERT J. PATTON, J., concurs,

MATT LYNCH, J., concurs in part and dissents in part, with a Dissenting Opinion.

_____

MATT LYNCH, J., concurs in part and dissents in part, with a Dissenting Opinion.

**{¶68}** I fully concur with the majority's disposition of the assignments of error except for the affirmance of the adjudication for Gross Sexual Imposition. There is a lack of evidence that P.V. compelled the victim to submit to sexual contact "***by force or threat of force.***" To be sure, kissing the victim's breasts without her consent is criminal conduct. However, without evidence of force or the threat of force, this conduct constitutes Sexual Imposition rather than Gross Sexual Imposition. Accordingly, I dissent and would reverse the adjudication for Gross Sexual Imposition.

**{¶69}** With respect to the Gross Sexual Imposition, the majority writes: "M.S. revoked her consent during the sexual activity of P.V. touching her breasts. She repeatedly told P.V. to stop yet he continued to give her hickies on her breasts, and while he did so, manipulated and removed her clothing." *Supra* at ¶ 56. The majority finds the element of force satisfied by the manipulation and removal of the victim's clothing while he continued to kiss her breasts. The removal of the victim's clothing, specifically her

18

Case No. 2023-T-0011

pants and underwear, was not related to the kissing of her breasts, i.e., the conduct constituting Gross Sexual Imposition.

{¶70} The victim testified that she initially consented to P.V. giving her hickies. The victim removed her shirt and allowed him to kiss her breasts. Eventually, she asked him to stop but he "kept going." At this point, the sexual contact was non-consensual but not compelled. P.V. "kept going" but there is no evidence that he did anything else that would constitute force or the threat of force in order to "[keep] going." In every case involving a comparable fact pattern, the courts have been able to point to an act by the defendant, beyond the commission of the offense itself, that demonstrates some exercise of force. *See*, *e.g.*, *State v. Tegarty*, 8th Dist. Cuyahoga No. 111855, 2023-Ohio-1369, ¶ 49 ("once the victim protested, asking and telling him to 'stop,' her consent was revoked and his repeated assurances of 'it's okay' while proceeding and continuing to have sexual intercourse with her and using his hand to hold her down by the neck and jaw amounts to forcible rape"); *In re E.S.*, 5th Dist. Delaware No. 21CAF080041, 2022-Ohio-2003, ¶ 41 ("after the second encounter began, she told appellant to stop and said 'no' repeatedly [and] attempted to stop him by raising her hand to his hip[;] [n]evertheless, * * * he continued sexual activity at a fast pace and pinned her wrist to the futon"); *In re S.W.E.*, 2d Dist. Greene No. 2020-CA-27, 2021-Ohio-80, ¶ 41 ("[e]ven if the encounter started out as consensual, * * * [the victim] put her hands on his chest and told him to stop * * *[,] kept pulling her pants back up and telling him no * * *[,] [a]nd said that she feared S.W.E. might hit her"); *State v. Hartman*, 2016-Ohio-2883, 64 N.E.3d 519, ¶ 32 (2d Dist.) ("[defendant's] conduct of pushing the victim on the bed, removing her clothes, and pulling her into the shower, was evidence from which a reasonable finder of fact could find that he purposely

19

acted in a manner that induced fear in the victim, compelling her to submit to his sexual conduct").

{¶71} In the present case, there is no evidence that P.V. employed even the most minimal amount of physical force to compel the victim to submit to his kissing her breasts. She asked him to stop and he "kept going." That is all the record has to offer with respect to Gross Sexual Imposition. The removal of the victim's pants, while certainly relevant in sustaining the Rape adjudications, had no connection with kissing the victim's breasts – conduct he was already engaged in. *Compare State v. Biggs*, 2022-Ohio-2481, 192 N.E.3d 1306, ¶ 22 (5th Dist.): "There was no evidence Appellant removed A.I.'s clothing or manipulated her clothing beyond reaching inside her pajama pants and underwear. Appellant did not tell the victim to do anything or refrain from doing anything, and did not threaten her in any way if she failed to comply. Appellant did not move or manipulate the victim herself, or any of her limbs. There was no testimony Appellant held her down in order to commit the act of touching her. While A.I. testified she forcibly removed Appellant's hand from inside her pajama pants, there is no evidence he struggled with her to continue touching her; rather, she was able to leave the room without interference from Appellant. Although A.I. was flustered, crying, and scared because she did not expect the touching to happen, there is no evidence in the record Appellant employed any force or threat of force beyond the force of the act itself, which is legally insufficient to meet the 'force' element of the crime of gross sexual imposition."

{¶72} It might seem a small matter to affirm the Gross Sexual Imposition charge in light of the three charges of forcible Rape of which P.V. was also adjudicated of committing. The harm in doing so is precedential. The majority acknowledges "the force

20

element needed to prove the offense of gross sexual imposition is the same as it is for rape." *Supra* at ¶ 49. To find the element of force satisfied by the existence of incidental, unrelated physical activity to sustain an adjudication for Gross Sexual Imposition is to establish precedent that can be applied to sustain a conviction for Rape – the penalty for which is much more significant than a twelve-month commitment to the Department of Youth Services.

{¶73} Accordingly, I respectfully dissent from the affirmance of the adjudication for Gross Sexual Imposition and would reverse this adjudication only.

Case No. 2023-T-0011